**THE SOUTH BAY CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 342, Docket 29349.

United States Court of Appeals Second Circuit.

Argued March 11, 1965.

Decided May 19, 1965.

Robert J. Casey, New York City (Clark, Carr & Ellis and Thomas E. Tyre, New York City, of Counsel), for petitioner.

Jonathan S. Cohen, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SMITH and MARSHALL, Circuit Judges, and DOOLING, District Judge.*

DOOLING, District Judge:

The South Bay Corporation petitions to review a decision of the Tax Court that disposed of three issues all of which arose out of the 1951 condemnation of all petitioner's water service properties and franchises by the Suffolk County Water Authority.

The Tax Court *first* decided that petitioner had acquired the properties of two water companies in 1925 in connection with reorganizations; that, in consequence, the properties had for petitioner the same basis that they had in the hands of the transferor corporations; and that, therefore, the gain petitioner realized when the Suffolk County Water Authority condemned the properties in 1951 should be determined by limiting petitioner to its transferors' basis for the properties. The decision of the Tax Court on this issue is reversed, on the ground that the transactions were purchases of properties and not acquisitions in connection with reorganizations, and the case is remanded for further proceedings consistent with this opinion.

The Tax Court decided, on the *second* issue, that petitioner had failed to establish the basis of intangible properties which petitioner bought along with tangible properties at global, unallocated prices from three other water companies

* Sitting by designation.

in 1925 and 1927, and that petitioner had also failed to negate the existence of adjustments to any basis that did exist; the Tax Court increased petitioner's taxable gain on the condemnation in the amount of alleged cost of the intangibles. (The same point is involved as to the properties allegedly acquired in connection with reorganizations.) The decision of the Tax Court on this second issue is reversed and the case is remanded to the Tax Court for further proceedings consistent with this opinion.

The Tax Court decided, as to the *third* issue, that an amount which petitioner received from Suffolk County Water Authority in the condemnation in exchange for the surrender of petitioner's right to apply for a refund of real estate taxes that petitioner had prepaid constituted ordinary taxable income to the petitioner and was not a part of the sales price in condemnation of the properties transferred. The decision of the Tax Court on the *third* issue is affirmed.

I

### The Reorganization Issue

In 1925 petitioner and four other water companies in Suffolk County were merged on the initiative of Francis W. Collins. Before the series of transactions involved, Collins had no interest whatever in any of the water companies and at the completion of the transactions Collins owned a majority of the common stock and control of petitioner, and petitioner had acquired all of the assets, tangible and intangible, of the four other Suffolk County water companies. Two years later in another transaction petitioner acquired a fifth water company. As to three of the water companies, Port Jefferson Water Company, Amityville Water Works Company and Kings Park Water Company, there is no question that petitioner bought their properties for cash, preferred stock issued at par and petitioner's assumptions of the liabilities of the transferor corporations. The "reorganization" question is raised in respect of the acquisitions of the other two companies.

Petitioner acquired the properties of the other two companies, Great South Bay Water Company and Southampton Water Works Company, on June 19, 1925. Collins owned a majority interest in and control of the stock of the transferor corporations just before the transfers of properties to petitioner. Immediately after the transfers, as before them, Collins had a majority interest in and control of petitioner. The argument is that the transactions were reorganizations within § 203(h) (1) (A) of the Revenue Act of 1924 (43 Stat. 257) since "reorganization" includes the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation or substantially all of the properties of another corporation, and since the requisite "continuance of interest * * * in the properties transferred" existed in Collins' continuing and augmented majority stock interest in and control of petitioner. Cortland Specialty Co. v. Commissioner of Internal Revenue, 2d Cir. 1932, 60 F.2d 937, 940; cf. Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 1933, 287 U.S. 462, 470, 53 S.Ct. 257, 77 L.Ed. 428. The necessary consequence, it is argued, is that under the provisions of § 113(a) (7) of the Internal Revenue Code of 1939 (53 Stat. 40) petitioner's basis for the properties is the basis of the properties in the hands of the transferor corporations, because the properties were acquired "in connection with a reorganization" and immediately after the transfer an interest or control in the property of 50% or more remained in the same persons or any of them, that is, remained in Collins. Certainly if Collins, owning controlling interests in three companies, merged them into one surviving corporation which he continued to control, the transaction would be a reorganization and the basis of the assets of the disappearing corporations would carry forward without gain or loss recognition on the transfer to the surviving company.

The present transactions, however, were not reorganizations because Collins'

ownership of the controlling stock of the transferor corporations was a transitional step in a many termed transaction that did not simply unite the properties of the three companies but also changed the ultimate ownership of the properties rather than continued them in the same ownership.

The facts about the transactions themselves as distinguished from their purpose and effect were entirely, if imperfectly, stipulated. Collins got an option on two-thirds of the stock of Southampton Water Works Company in November 1924, and between November 21, 1924, and April 9, 1925, he bought all of the stock of petitioner. On the latter date he became president and a director of petitioner. Meanwhile Collins had contracted, on February 28, 1925, to buy for cash, for delivery on May 15, 1925, 40% of the common and about 29% of the preferred stock of Great South Bay Water Company, and in the same contract Collins agreed to buy the shares of any other shareholders of Great South Bay Water Company. By April 14, 1925, Collins had 81% of the common and 59% of the preferred stock of Great South Bay.

On April 14th petitioner made a letter offer to the stockholders of Great South Bay to acquire their stock in exchange for preferred stock of petitioner and a cash bonus. Since Collins already owned 81% of Great South Bay's common stock and 59% of its preferred stock on the day the letter was sent, the offer was very largely made to him. (The offer was apparently available to those stockholders of Great South Bay who had already deposited their stock in acceptance of the cash offer earlier made.) On April 21st petitioner authorized its officers to offer to acquire from Great South Bay all of its properties subject to an outstanding bond issue of $400,000 in consideration of petitioner's assuming all the debts of Great South Bay and paying to Great South Bay or to its stockholders a cash amount for each share of its preferred and common stock, that offer to be alternative to the offer made

by the letter of April 14th to issue petitioner's preferred stock and to pay a cash bonus for the Great South Bay stock. Whatever was contemplated, as the Tax Court has pointed out the transaction was consummated on a basis different from both the offers disclosed in the stipulation of facts.

On June 19, 1925, petitioner had acquired all the Great South Bay stock and on that day petitioner acquired all the assets of Great South Bay and issued in exchange 6,650 shares of its own common stock, 3,377.6 shares of preferred stock and $750,000 of its own bonds, and, in addition, petitioner took the assets subject to a bond issue of $400,000, assumed liabilities in the amount of $508,174 and paid cash of $36,668.

On June 1, 1925, Collins offered to sell to the petitioner the two-thirds of the total shares of Southampton Water Works Company stock, on which he still had only an option, in exchange for petitioner's bonds and preferred stock, and also to transfer some cash to the petitioner; that offer was accepted by the petitioner on the same day. On the same day the petitioner offered to purchase from Southampton all of its assets, to assume all its debts and to pay to it or on its order to its stockholders cash and preferred stock of petitioner measured by the amount of Southampton's outstanding stock.

On June 19th, Collins acquired the Southampton stock and on the same day petitioner acquired that stock from Collins and acquired all of the rest of the Southampton stock from its other stockholders. On the same day petitioner acquired all Southampton's assets, assumed all its liabilities and issued petitioner's own bonds and preferred stock in payment.

At the close of June 19th, then, Collins was in control of petitioner and petitioner had acquired all the properties of Great South Bay and Southampton.

The Tax Court was satisfied that Collins planned from the outset to bring about the mergers and remain in con-

trol of the continuing corporation (41 T.C. at 903) and that, after getting the November option on the Southampton stock, Collins started buying petitioner's stock "as the nucleus for his proposed merger" and that, before completing his purchase of petitioner's stock, he made the contract under which he later got control of Great South Bay (41 T.C. at 891). The mergers were consummated as planned from the outset. In no business sense was any one of Collins' acquisitions or dispositions to petitioner, of the Great South Bay or the Southampton stock a self-complete transaction, or independent of or alien to the original unification plan.

In each of the two challenged property transactions the petitioner first acquired the stock of the transferor corporation and then acquired its assets. In 1925 gain and loss were recognized on liquidations of subsidiary corporations into parent corporations. Burnet v. Aluminum Goods Mfg. Co., 1933, 287 U.S. 544, 550–551, 53 S.Ct. 227, 77 L.Ed. 484; Burnet v. Riggs National Bank, 4th Cir. 1932, 57 F.2d 980; Black River Sand Corporation, 1929, 18 B.T.A. 490, 497–498. If respondent is to prevail, it must therefore appear that it was the underlying properties as such that were acquired as an integral part of the supposed reorganizations and not the stock, as such, of the transferor corporations: the petitioner's ownership of the transferors' stocks must appear as transitory and incidental parts of plans of reorganizations that had as their final objectives the acquisition of the transferors' assets. Contrast Piedmont Financial Company, Inc., 1932, 26 B.T.A. 1221, 1224, with Warner Company, 1932, 26 B.T.A. 1225, 1228. Similarly, it is not possible in principle to avoid determining the identity of the full transaction in reality involved and to identify the total of the steps that make up the substance of that transaction.

The predetermined program of uniting the properties of all three of the companies in petitioner as an operating company and in a new ultimate beneficial ownership, that, dominantly, of Collins, defines the real terms of the full transaction involved. In that transaction Collins' intermediate acquisition and disposition to petitioner of the transferors' stocks were transitory steps and not independent, unrelated ventures into stock ownership. The "Kimbell-Diamond rule" (Kimbell Diamond Milling Co., 1950, 14 T.C. 74, aff'd, 5th Cir. 1951, 187 F.2d 718) is not strictly involved, since it dealt with an acquisition of stock as a means of acquiring assets followed immediately by a liquidation that would have been regarded as a basis-preserving tax-free liquidation if the transactional purpose—acquiring assets rather than stock—had not deprived the intermediate stock acquisition of tax significance. But it illustrates that essential transactional purpose telescopes steps even when the intermediate step of stock acquisition, as in Kimbell-Diamond, is an indispensable event in the making of the transaction and not an empty and dispensable circuity or multiplication of steps. Cf. State of Minnesota Tea Co. v. Helvering, 1938, 302 U.S. 609, 612–613, 58 S.Ct. 393, 82 L.Ed. 474; Pickard v. Commissioner of Internal Revenue, 2d Cir. 1940, 113 F.2d 488.

The "step analysis" of transactions does not operate in terms of an estoppel of taxpayers to deny the forms of their transactions but in terms of the reality of the transactions. Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6th Cir. 1938, 99 F.2d 588, 591; cf. Ahles Realty Corporation v. Commissioner of Internal Revenue, 2d Cir. 1934, 71 F.2d 150; Bassick v. Commissioner of Internal Revenue, 2d Cir. 1936, 85 F.2d 8. Where, as here, the transaction presents the determining elements of a change in ultimate ownership and an initial purpose or intention to acquire assets rather than stock as such, each intermediate stage to the final end is not to be given the separate tax significance that belongs only to self-complete business transactions, but the full transaction is to be weighed in its overall terms for its tax characterization.

Prairie Oil & Gas Co. v. Motter, 10th Cir. 1933, 66 F.2d 309; Republic Steel Corp. v. United States, 1941, 40 F.Supp. 1017, 94 Ct.Cl. 476; Southwell Combing Co., 1958, 30 T.C. 487, 498; North American Service Co., 1960, 33 T.C. 677. The transitory ownership of Collins does not define the transaction as a "reorganization" in despite of the overall change in the significant beneficial interests. Cf. Helvering v. Bashford, 1938, 302 U.S. 454, 458, 58 S.Ct. 307, 82 L.Ed. 367; Helvering v. State of Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 184–185, 62 S.Ct. 540, 86 L.Ed. 775; Georgia-Pacific Corporation v. United States, 5th Cir. 1959, 264 F.2d 161; American Wire Fabrics Corporation, 1951, 16 T.C. 607; Montana-Dakota Utilities Co., 1955, 25 T.C. 408, 414–415; Long Island Water Corporation, 1961, 36 T.C. 377, 392–393.

 The Tax Court considered the two transactions reorganizations rather than asset purchases because Collins had not acted as petitioner's agent but as a principal (as the Tax Court, properly, found) and because the transactions or steps beginning with Collins' stock acquisition and ending with the mergers were not so integrated or interdependent as to be *solely* for the purpose of petitioner's purchase of assets, particularly since the Court noted that there had been no showing that the properties could not have been acquired by direct purchase (41 T.C. at 903–904). The Court imposed too strict a test in applying the dubious "sole purpose" and "no alternative" tests drawn from the Kimbell-Diamond line of cases (e. g., Long Island Water Corporation, supra, 36 T.C. at 390; cf. American Bantam Car Co., 1948, 11 T.C. 397, aff'd, 3rd Cir. 1949, 177 F. 2d 513) to the related but different question of determining whether each one of a set of steps has a separate business completeness and, therefore, a separate tax significance or is only a part of a single overall transaction for the purpose of assaying its nature as a reorganization or a purchase. The "sole purpose" and "no alternative" language used in the Kimbell-Diamond line of

cases may be apt guides in determining whether the specific purpose of the whole transaction is, precisely, to acquire assets, as such, and not stock, but it cannot help to resolve the question whether a set of steps resulting in a property acquisition took place by purchase or "in connection with a reorganization." The latter determination is made by now classic standards for analyzing the overall substance of transactions to see whether they reflect a change in ownership or only a change in the form of a continuing ownership, or reflect a union of properties characterized by a continuity of interests of ownership that pre-existed the union of the properties. Cortland Specialty Co. v. Commissioner of Internal Revenue, supra.

That there must be some species of integrating factor to make it rational to define steps as parts of a single transaction is apparent, but it must be doubted that the degree of integration requisite can be, or ought to be, reduced to any rigid formula of integration or interdependence of steps or can, or ought to, go to the extreme of requiring that each step be devoid of business significance unless united with one or more of the other steps. That would import a rigidity of interpretation appropriate only to legislative enactment and inappropriate to the interpretation of a statute that is general in its formulation.

 There was not here any intention at any time to acquire and maintain a separate ownership of the various companies; the program from beginning to end visualized merging all of the properties into petitioner as a nucleus. Hence the Court's later finding that the transactions were independent transactions in which Collins individually acquired a majority stock interest in and control of Great South Bay and Southampton prior to his transfer of the stock to petitioner is a characterization of legal effect rather than a factual finding. There was no deviation from the single original plan of mergers; its steps were closely paced in the events between April 9 and June 19, when the transactions were consum-

mated. On the facts, the principle that the transaction delimited by an overall plan must be characterized for tax purposes from a comparison of the situation as it existed before the first step of the transaction with the situation existing after the last step of the transaction results in the conclusion that a purchase of assets and not a reorganization was involved in each instance. The decision of the Tax Court on the first issue must, in consequence, be reversed.

## II

### The Intangibles Basis Issue

In its return of 1951 tax petitioner claimed a cost basis for "Franchises, etc. * * *" of $2,314,658; respondent wholly disallowed the basis and he correspondingly increased the capital gain realized on the condemnation of petitioner's properties by the Suffolk County Water Authority. $1,815,908 of the total of $2,314,658 so claimed as basis and disallowed represents the sum of the par value of the securities issued, the cash paid out, and the debts assumed by petitioner in acquiring the five water company properties, reduced by the book value of the "physical properties" of the five water companies as they were carried on the books of the transferor water companies. The balance of the $2,314,-658 claimed as basis and disallowed represents a $498,750 difference between the par value of petitioner's common stock issued to acquire the Great South Bay properties and the claimed 1925 fair market value of that stock. The latter disallowance is not contested.

Petitioner claims that inasmuch as it has been stipulated that the "excess of purchase price over the original book value [for the physical properties] of the predecessor company was not depreciated for tax purposes," and as it has also been stipulated that the "physical properties * * * acquired by [petitioner] were carried at its cost for book and tax purposes," the "excess" of $1,815,908 must be the "cost" to petitioner of the franchises and other intangibles; petitioner further claims that since such intangi-

bles are not subject to deductible allowances for wastage through time, the original "cost" of the intangibles is their adjusted basis for the present capital gain computation.

The respondent contends that petitioner has failed to overcome the presumptive correctness of the disallowance because it has failed to show how the original cost was or could have been allocated as between the physical properties and the intangibles purchased, and it has failed to negate the existence of basis adjustments [Internal Revenue Code, 1939, § 113(b), (53 Stat. 40, 66 Stat. 629)]. It is not clear whether respondent accepts or rejects the contention that the "cost" to petitioner of the "physical properties" has been stipulated as being the 1925 "book value" of those properties or accepts as true petitioner's assertion that respondent conceded that datum in the Tax Court. The point is critical to petitioner's argument that the balance of the global cost is—by subtraction—the "cost" of the intangibles.

In the Court below the issue was confined to the Port Jefferson, Amityville and Kings Park acquisitions, but since it has here been concluded that the Great South Bay and Southampton transactions were also property purchases and not reorganizations, the issue equally affects those properties. The $1,815,908 figure includes the Great South Bay and Southampton figures (41 T.C. at 896) and the stipulation of facts is essentially the same for all five properties.

The Tax Court held that the stipulated facts showed only the book value of the physical properties of each transferor on the day of acquisition and failed to show the fair market value of the tangibles and intangibles respectively or any other foundation for allocating to the intangibles a portion of petitioner's total cost, even assuming, on the record, that cost included the par value of the securities issued upon acquisition. The Court held, too, that the record failed to show whether the intangibles were subject to adjustment for depreciation or otherwise in arriving at petitioner's adjusted basis.

It therefore sustained the respondent's disallowance of the claimed basis of $2,-314,658.

As to each water company purchase it is stipulated that petitioner "recorded" the acquired "assets on its books at cost," that is, at the sum of cash paid out, par value of the securities issued, and liabilities assumed. It is then stipulated as to each set of acquired properties that the transferor's books "reflected, as of the date of its acquisition by [petitioner], physical properties in [a stated dollar] amount * * * of which [a stated dollar amount] was attributable to land. Petitioner * * * recorded the assets at its cost on its books in its Fixed Capital account." Then, as to all the properties together it is stipulated that, "The physical properties thus acquired by [petitioner] were carried at its cost for book and tax purposes. The excess of purchase price over the original book value of the predecessor company was not depreciated for tax purposes."

Although it is stipulated that the acquired "physical properties" were carried at petitioner's "cost for book and tax purposes," no more can possibly be meant than that the transferor's book entries with respect to the physical properties were carried forward in some undisclosed manner in petitioner's books as "cost" for tax purposes, that depreciation was claimed only on such book values, and that no depreciation was claimed on the balance of the original "cost," that is on the "excess of purchase price over the original book value of the predecessor company." That is compatible with the arithmetic of the case (41 T.C. at 896). It is, however, elsewhere stipulated that the "Fixed Capital account" at the end of 1929 showed "Cost of Fixed Capital Acquired" at $3,125,763.14, presumably inclusive of the cost of "other small properties" acquired before the end of 1929, and that the depreciation reserve (not deducted from the $3,125,763.14 but carried against it as a liability) was $422,-046.94. And it is further stipulated that the balance sheets supplied as part of petitioner's tax returns for 1925 to 1951 showed the "Fixed Capital account" without allocation between depreciable and nondepreciable assets.

The stipulation is not, certainly, an agreement between the parties that transferor book values of "physical properties" were also current market value in 1925 or that the transfer book values represented a portion of the cost that was properly allocable out of the global cost to the "physical properties." The only conclusion safely to be drawn from the stipulation is that the parties agreed that the global cost was entered as "cost" in an account called Fixed Capital and was not in that account broken down as between physical properties and intangibles, and that depreciation was claimed only on the transferors' book values and not on the total "cost" of transferors' assets. If that is what happened and what has been stipulated as having happened then, oddly, the meaning of the stipulations that the "physical properties were carried at [petitioner's] cost" and that petitioner "recorded the assets at its cost on its books," would not be that the "physical properties" were carried at transferors' book values on petitioner's books as its cost but, rather, that they were (variously labeled as "fixed Capital," or "Utility Plant," or "Plant and Equipment") treated in petitioner's books as accounting for the whole of the global cost, although no depreciation was claimed for the excess of "cost" over transferors' book values. Possibly it was supposed that basis was determined under Section 204(a) (7) of the Revenue Act of 1924 (43 Stat. 253, 259).

On the uncertain record so presented and the dubious significance of the "concession" of respondent's counsel in the Court below that "the parties have stipulated only to the value of 'physical properties,'" the Tax Court did not err in refusing to hold that the record established a foundation for breaking down the global cost between the cost of physical properties and the cost of all other assets. Indeed, the respondent's "concession" was a negating statement of the meaning of three short paragraphs of the stipu-

lated facts; each paragraph said as to a different transferor company that its "books * * * reflected * * * physical properties in the amount of" so many dollars, and that petitioner "recorded the assets [*not* the 'physical properties'] at cost in its Fixed Capital account." In its reply brief below the respondent contended, as the Tax Court concluded, that the parties had stipulated only the "book figures" of *tangible* assets on the transferors' books and the "cost" of all assets, and respondent argued, as the Tax Court concluded, that no means of distributing the global "cost" between tangibles and intangibles had been shown.

■■ There appears, nevertheless, to be a genuine question about the intention of the stipulation, and its language is not precise enough to resolve the question. It is for the Tax Court and not for this Court to determine whether the parties should, upon a proper application, be relieved of the stipulation either because it failed to express the common intention which they meant to express, or because the parties had not reached any genuine agreement but were stipulating at cross purposes in language devoid of the requisite certainty of meaning. If there was vitiating mistake in the process of stipulating, resulting in the Tax Court's having an inadequate record, the case would not necessarily be, as respondent contends, a simple case of failure of proof in the primary sense, particularly since the result has been to sustain a possibly arbitrary determination of nil value in a context in which that is an improbable inference. Cf. Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Underwood v. Commissioner of Internal Revenue, 4th Cir. 1932, 56 F.2d 67, 72–74; Worcester County Trust Co. v. Commissioner of Internal Revenue, 1st Cir. 1943, 134 F.2d 578, 580; Durkee v. Commissioner of Internal Revenue, 6th Cir. 1947, 162 F. 2d 184, 187, on remand, 1949, 8 T.C.M. 701, 703–705, aff'd, 6th Cir. 1950, 181 F.2d 189; see Harbor Plywood Corp. v. Commissioner of Internal Revenue, 9th Cir. 1944, 143 F.2d 780, 783. The case is rather one that leaves open for further proceedings on remand the linked questions whether such a deficiency determination as respondent made can be sustained on the present stipulation of facts, on the ground that it wittingly presented inadequate proof (the Taylor and Durkee cases being deemed inapplicable), or whether the inadequacy of proof was due to mistake or excusable neglect in the process of discharging the duty of stipulation under Tax Court Rule 31(b), and, if so, whether that mistake or neglect is now available as a ground of relief by motion for rehearing in the Tax Court. Cf. Hoagland Corporation v. Helvering, Commissioner, 2d Cir. 1941, 121 F.2d 962, 964; Reo Motors, Inc. v. Commissioner of Internal Revenue, 6th Cir. 1955, 219 F.2d 610.

■■ If the 1925 cost to petitioner of the physical properties were determined, there is certainly a reasonable inference that the balance of the global cost "represented the cost of unspecified intangible assets" (Copperhead Coal Co. v. Commissioner of Internal Revenue, 6th Cir. 1959, 272 F.2d 45, 47) which, in the instant case could well embrace the franchises of the group of water companies (N. Y. Transportation Corporations Law, McKinney's Consol.Laws, c. 63, §§ 40–47), the customer good will of the companies, and their going concern values. Such values may be determined by subtraction as well as by direct valuation (Commissioner of Internal Revenue v. Chatsworth Stations, Inc., 2d Cir. 1960, 282 F.2d 132, 136) and it is not to be required that, at this date, precise valuations be shown if that is no longer possible. Cf. Prosperity Company, Inc., 1951, 17 T.C. 171, 185–187, aff'd 2d Cir. 1953, 201 F.2d 499.

■ If for twenty-six years no depreciation was claimed or allowed on any purchased properties except the physical properties, and if there is no plausible suggestion that intangibles of a specifically depreciable kind are involved, or that some specific basis adjustment is appropriate, it would appear that at a dis-

tance of forty years it is just to indulge the common sense inference that any balance of original cost over and above the cost of the physical properties was cost of intangibles not subject to basis adjustment. Cf. Copperhead Coal Co. v. Commissioner of Internal Revenue, supra. Its appropriate legal effect is not to be denied to a genuine cost on the barren conjecture that some unspecified part of it could in theory have been subject to an unspecified basis adjustment chargeable to the revenue of some earlier taxable year.

Distribution of the 1925 global cost between the physical properties and the intangibles on the allegedly stipulated basis or on some other basis, as further proceedings may determine, remains a prerequisite to reaching a conclusion different from that which the Tax Court reached. There is, of course, no principle that entitles petitioner to a cost basis for the intangibles on the bare ground that it has claimed and been allowed depreciation only on an amount which it treated as cost of physical properties but which may well have been far more or far less than the physical properties' fair 1925 value and inferred actual cost. Cf. Virginian Hotel Corporation of Lynchburg v. Helvering, 1943, 319 U.S. 523, 526, 63 S.Ct. 1260, 87 L.Ed. 1561, 152 A.L.R. 871.

So far as the Court below based its decision on the failure of petitioner to negate the existence of basis adjustments, it is reversed and the case is remanded for further proceedings consistent with this opinion.

### III

#### The Prepaid Taxes Issue

On the effective date of condemnation, May 31, 1951, petitioner had prepaid $53,433.36 of real estate taxes levied by the villages of Babylon, Islip, Brookhaven, Smithtown and Southampton. The levy date for the taxes was December 1, 1950. Cf. N. Y. Village Law, McKinney's Consol.Laws, c. 64, §§ 112, 115, 115–c, 116, as in effect in 1951. The date when the taxes became a lien and

the fiscal period for which the taxes were assessed have not been stipulated. Petitioner and the condemning authority agreed that to avoid doubt of the petitioner's right to apply for refunds of prepaid real estate taxes, petitioner would not apply for refunds and the condemning authority would pay petitioner a sum equal to the amount of taxes prepaid. It is stipulated that the condemning authority paid the tax amount to petitioner "as part of the condemnation award."

The Tax Court held that the amount was taxable as ordinary income rather than as a capital gain because petitioner had not shown that it received the prepaid tax amount for its property as such or for any other capital asset as distinguished from having received the money as reimbursement of a prepaid expense (41 T.C. at 907–908).

If an agreement having the same dollar effect as that made with the condemning authority had been made as a conventional tax apportionment at the closing of a land sale between private parties, the tax burden assumed by the buyer, whatever the form of words used, would not have been deductible as a tax paid by him but would have been treated as part of the purchase price of the property, provided title had passed after the day on which, under local law, the tax became a charge on the land or a liability of the vendor; petitioner as vendor would have been entitled to deduct the whole tax from its income, and it would have been required to treat what it received from the condemning authority for the prepaid taxes as part of the sales price. Magruder v. Supplee, 1942, 316 U.S. 394, 62 S.Ct. 1162, 86 L.Ed. 1555; VanDyke v. United States, E.D.Wis. 1957, 156 F.Supp. 155; Norman Cooledge, 1939, 40 B.T.A. 1325; S.M. 4122, 1926, I–1 C.B. 55. But the present case was not a sale between private parties but a condemnation. The parties elected to deal with the tax point in terms of a surrender for value by petitioner of its claim to obtain reimbursement of the taxes from the villages. If petitioner had retained and successfully pursued

the claim, the recovery would have been income when received (if petitioner had deducted the taxes in a prior year, Lexmont Corporation, 1953, 20 T.C. 185) or the recovery of the taxes would have precluded the deduction of the tax amount from gross income of any earlier year (cf. United States v. Consolidated Edison Co., 1961, 366 U.S. 380, 387, 81 S.Ct. 1326, 6 L.Ed.2d 356); but in either event it would have been altogether an income account matter and not at all a capital gain or loss matter. The transfer of a right to an amount which, if received, will be ordinary income can itself be the occasion of a realization of income. Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; cf. Hort v. Commissioner of Internal Revenue, 1941, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168. So here: since the petitioner received money for its claim for reimbursement of prepaid and deductible taxes, the receipt was of an ordinary income nature. Its character as an income or capital receipt was determined by the nature of the claim upon which it was received. Cf. Lyeth v. Hoey, 1938, 305 U.S. 188, 196–197, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410; Johnston v. Helvering, 2d Cir. 1944, 141 F.2d 208; McCullough v. Commissioner of Internal Revenue, 2d Cir. 1946, 153 F.2d 345. But cf. Dovey v. United States, 3rd Cir. 1958, 254 F.2d 538, 540. If the tax amount received from the condemning authority was circumstantially not income, it was for petitioner to show the circumstances (cf. Security Flour Mills Co. v. Commissioner of Internal Revenue, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; United States v. Consolidated Edison Co., supra). But the alternatives of taxable status would be inclusion as ordinary income or entire exclusion from gross income, and capital gains treatment would not be a possible alternative.

■ Whether a different conclusion would follow if the supposed refund claims against the villages were utterly unreal need not be considered. The question of the possible reimbursement of such prepaid taxes was not unreal. The point was apparently submitted to the New York State Comptroller and in Opinion 63–435, 1963, 19 Op.St.Compt. 277 he ruled that the Suffolk County Water Authority could not successfully claim exemption from village taxes for real property acquired by it after taxable status day even though under Section 1082 of the New York Public Authorities Law McKinney's Consol.Laws, c. 43–A the water authority was not required to pay any taxes or assessments "upon any of the properties acquired by it or under its jurisdiction or control or supervision." The liability of condemned property for real estate taxes seemingly applicable to the post-condemnation period has come up repeatedly in New York and in some circumstances it has been held that the intervention of condemnation can work a whole or partial relief from real estate taxes. Cf. Buckhout v. City of New York, 1903, 176 N.Y. 363, 370, 68 N.E. 659; Berri v. City of New York, 1st Dept. 1940, 259 App.Div. 453, 19 N.Y.S.2d 347. But cf. Matter of Suffolk County, 14 Misc.2d 1008, 183 N.Y.S.2d 836. See Annotation, 1956, 45 A.L.R.2d 522, 533, 544; United States v. Certain Lands, E.D.N.Y.1941, 41 F.Supp. 51; United States v. 44,549 Square Feet of Land, E.D.N.Y.1941, 41 F.Supp. 523. Against this background there can be no shadow of an assumption that petitioner would have received the same amount in condemnation whether it retained or surrendered its claim against the villages for refund of the prepaid taxes. The treatment accorded the tax point in the condemnation agreement was not formal and unrealistic but a substantial contractual dealing with a respectable claim for reimbursement of a deductible charge. The stipulation that the tax amount was paid "as part of the condemnation award" states a mechanics of disbursement; it does not—as on any other interpretation it would—stipulate the respondent out of court on the issue.

The decision of the Tax Court on the prepaid taxes issue is affirmed.

The decision of the Tax Court is reversed insofar as it determined that petitioner acquired the assets of Great South Bay Water Company and Southampton Water Works Company in connection with reorganizations and insofar as it determined that petitioner failed to negate the existence of adjustments to the basis of intangible assets purchased in 1925 and 1927 and is affirmed insofar as it determined that the amount received in respect of prepaid taxes was properly included in ordinary income and the case is remanded to the Tax Court for further proceedings consistent with this opinion.