**Philip GROVE and Harriet Grove,
Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 847, Docket 73-1037.**

United States Court of Appeals,
Second Circuit.

Argued May 24, 1973.

Decided July 27, 1973.

**242**

Wesley J. Filer, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Elmer J. Kelsey, Attys., Tax Div., Dept. of Justice, Washington, D.C., on the brief), for appellant.

Mason G. Kassel, New York City (R. Palmer Baker, Jr., and Lord, Day & Lord, New York City, on the brief), for appellees.

Before KAUFMAN, Chief Judge, and KILKENNY * and OAKES, Circuit Judges.

KAUFMAN, Chief Judge:

We are called upon, once again, to wrestle with the tangled web that is the Internal Revenue Code and decipher the often intricate and ingenious strategies devised by taxpayers to minimize their tax burdens. We undertake this effort mindful that taxpayer ingenuity, although channelled into an effort to reduce or eliminate the incidence of taxation, is ground for neither legal nor moral opprobrium. As Learned Hand so eloquently stated, "any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes . . . ." Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

The case before us involves charitable contributions to an educational institution. It is becoming increasingly apparent that colleges and universities must engage in extensive fund-raising if they are to continue to exist and provide quality education. In their efforts to induce alumni to make substantial contributions, these institutions have devised interesting gift plans which offer attractive, and legal, tax advantages to the donor. Philip Grove,[1] a successful engineer, was one who responded to the needs of his alma mater, Rensselaer Polytechnic Institute ("RPI"). Thus, in 1954, he began making annual donations to RPI of 165 to 250 shares of Grove Shepherd Wilson & Kruge, Inc. ("the Corporation"), a closely held corporation of which he is majority shareholder, vice-president, and a director. In each instance, Grove retained a life interest in any income earned from his gift and limited his charitable contribution deduction to the value of the remainder interest received by RPI. Despite the absence of any prearranged agreement between Grove and RPI, each year between 1954 and 1964 RPI successfully offered individual groups of shares to the Corporation for redemption. RPI then invested the redemption proceeds in income-producing securities and made quarterly disbursements to Grove of any income received. Grove reported any federally-taxed items on his personal income tax returns for the year of receipt.

The Commissioner of Internal Revenue refused to approve these arrangements. Instead, he assessed deficiencies in Grove's income taxes for the years 1963 and 1964, contending that Grove had employed RPI as a tax-free conduit for withdrawing funds from the Corpo-

---

* Of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. Harriet Grove, Philip's wife, is a party to these proceedings solely by virtue of having signed their joint federal income tax return for years in which the Commissioner of Internal Revenue assessed deficiencies. Our subsequent references to "Grove" refer to Philip.

ration and that redemption payments by the Corporation to RPI were in reality constructive dividend payments to Grove. Grove successfully challenged the deficiency determinations in the Tax Court, and the Commissioner appealed. We affirm.

## I.

A full recitation of the undisputed facts underlying this controversy will aid in placing the legal issues raised on appeal in their proper context.

Philip Grove received an engineering degree in 1924 from Rensselaer Polytechnic Institute, a private, tax-exempt educational institution. During the Depression, he founded what is now Grove Shepherd Wilson & Kruge, Inc. and at all times since has controlled a majority of its shares.[2] The balance of the Corporation's shares, with the exception of those held by RPI, are owned by officers and employees of the Corporation or their relatives.

The Corporation's business is building airfields, highways, tunnels, canals, and other similar heavy construction projects in both the United States and foreign countries. These projects usually involve the investment of large sums of money over an extended period of time and involve a high degree of risk. Since, in this industry, contract payments normally are made only after specified levels of progress are achieved, a firm must always commit substantial amounts of its own funds, whether borrowed or internally generated, to a project. Moreover, a company can determine an acceptable contract price based only on its best estimate of the cost to complete the project. A bad "guess" or

unforeseen contingency may require a firm to complete a project while incurring a loss. Not surprisingly, the mortality rate in this industry is high. To protect against such adverse developments, successful firms seek to maintain liquidity by holding ample cash or other assets easily converted to cash. One method of conserving cash, adopted by the Corporation, is to retain all earnings and refrain from paying dividends.

As we have noted, RPI, like all universities and colleges, pursued its alumni with a wide variety of contribution plans. One plan employed "life income funds," and its terms were simple. An alumnus would make a gift of securities to RPI and retain a life interest in the income from the donated securities. Whatever dividends and interest were paid during the donor's life would belong to the donor, while any capital appreciation would inure to RPI. Upon the death of the donor, RPI would obtain full title to the securities.

In 1954, Dr. Livingston Houston, RPI's president, suggested to Grove that he make a gift under the "life income funds" plan. Grove explained that his only significant holdings were shares of his own corporation, but expressed a willingness to donate some of these shares under the plan, with certain qualifications. The Corporation, he stated, could not agree to any obligation or understanding to redeem shares held by RPI. This condition, of course, stemmed from a fear that RPI might seek redemption at a time when the Corporation was hard pressed for cash, which, as we have noted, was an asset crucial to a company in the heavy construction business. Moreover, since Grove at that time was unsure of RPI's

2. On December 31, 1964, a date after which the record is bare, Grove directly held 14,931 of 22,484 shares outstanding. In addition, 3,076 shares were owned by a voting trust holding shares for Grove's children which Grove controlled.

As noted, Grove also is a vice-president and a member of the board of directors of the Corporation. The other directors —each of whom owns shares of the Cor-

poration—are E. W. Shepherd, who serves as president of the Corporation, Sidney A. Houck, the Corporation's treasurer, and George Kruge. Due to the close knit nature of the Corporation's ownership, its officer-owners manage company affairs through informal decision-making processes and rarely hold formal board of directors or shareholders meetings.

money-management qualifications, he further conditioned his gift on a requirement that if RPI disposed of the shares, any proceeds would be invested and managed by an established professional firm.

RPI found these terms acceptable and on December 30, 1954, Grove made an initial gift of 200 shares, valued at $25,560. A letter accompanying the donation set forth the conditions we have recited. Moreover, in addition to retaining an interest in the income from the gift for his life, Grove specified that in the event he should predecease his wife Harriet, she would receive the income until her death.

On the same day, the Corporation and RPI signed a minority shareholder agreement. RPI agreed not to "sell, transfer, give, pledge or hypothecate, or in any way dispose of the whole or any part of the common stock of the Corporation now or hereafter owned . . . until [RPI] shall have first offered the Corporation the opportunity to purchase said shares upon the terms and conditions hereinafter provided." The redemption price was established at book value of the shares as noted on the Corporation's most recent certified financial statement prior to the offer. Pursuant to the contract, the Corporation was "entitled (but not obligated) to purchase all or any part of the shares of stock so offered." If the Corporation did not exercise its option to purchase within sixty days, RPI could transfer the shares to any other party and the Corporation's right of first refusal would not subsequently attach to such transferred shares.[3]

The 1954 gift was the first in a series of annual contributions to RPI by Grove. From 1954 to 1968,[4] Grove donated to RPI between 165 and 250 shares of the Corporation each year, reaching a cumulative total of 2,652 shares, subject to terms substantially similar to those noted earlier.[5]

Generally, RPI offered donated shares to the Corporation for redemption, between one and two years after they were donated by Grove.[6] The transactions followed a similar pattern. On each occasion, the Finance Committee of RPI's Board of Trustees first authorized the sale of specific shares of the Corporation. RPI's treasurer or controller would then write to Sidney Houck, the Corporation's treasurer, informing him of RPI's desire to dispose of the shares. Upon receipt of this letter, Houck would call a special meeting of the Corporation's board of directors to consider whether or not to exercise the Corpora-

3. Other minority shareholders of the Corporation signed similar agreements, which, in effect put in writing the Corporation's practice of redeeming, when financial conditions permitted, any minority-owner shares offered to it, for example, by a departing employee or a deceased employee's widow.

4. On August 20, 1963, Grove donated to RPI 70 shares of Thompson Construction Corporation, a gift unrelated to the present controversy. Grove made no gift of his corporation's stock to RPI in 1963.

5. During this period, Grove became progressively more involved in RPI's affairs. After 1954, he met RPI officials other than Dr. Houston. In 1957, Grove was elected a trustee of RPI for a four-year term ending in 1961. In 1965, he returned to the board of trustees as a life trustee and, when he resigned in 1969 at

the age of sixty-five, he was elected an honorary trustee.

6. The following table discloses the number of shares, date donated, date of redemption (if made), and (if redeemed) amount paid by the Corporation to RPI:

| Date Shares Donated by Grove to RPI | Number of Shares Donated | Date Shares Redeemed from RPI by the Corporation | Amount Paid to RPI |
|---|---|---|---|
| 12/30/54 | 200 | 12/29/55 | $23,000 |
| 12/21/55 | 220 | 12/28/56 | 25,300 |
| 12/26/56 | 220 | 12/23/57 | 26,840 |
| 12/11/57 | 205 | 12/27/58 | 26,035 |
| 12/29/58 | 195 | 11/6/59 | 24,570 |
| 12/28/59 | 200 | 12/27/60 | 23,500 |
| 11/15/60 | 210 | 3/7/62 | 26,250 |
| 10/31/61 | 200 | 1/4/63 | 29,000 |
| 11/30/62 | 172 | 4/24/64 | 25,800 |
| 12/18/64 | 165 | — | — |
| 8/23/65 | 165 | — | — |
| 12/6/67 | 250 | — | — |
| 12/4/68 | 250 | — | — |

tion's right of first refusal. The Board would adopt a resolution authorizing redemption and Houck would so inform RPI's financial officer, enclosing a company check for the amount due. By return mail, RPI would forward the appropriate stock certificate to the Corporation for cancellation.

At the time of the first redemption, in December, 1955, RPI opened an investment account at the Albany, New York, office of Merrill Lynch, Pierce, Fenner & Beane ("Merrill Lynch"). The account was captioned "Rensselaer Polytechnic Institute (Philip H. Grove Fund) Account." In accordance with Grove's wishes concerning the management of disposition proceeds, RPI authorized Merrill Lynch to act directly upon investment recommendations made by Scudder, Stevens, & Clark, Grove's personal investment adviser. RPI deposited the proceeds of each redemption transaction into this account which, pursuant to Scudder, Stevens & Clark's instructions, were generally invested in securities of large corporations whose shares traded on organized stock exchanges. Merrill Lynch paid the income from these investments to RPI on a monthly basis. RPI, in turn, made quarterly remittances to Grove, accompanied by an analysis of all account transactions.

On his personal income tax return for 1963, Grove reported as taxable income dividends of $4,939.28 and interest of $2,535.73 paid to him by RPI from the Merrill Lynch account. For 1964, Grove reported $6,096.05 in dividends and $3,540.81 in interest.[7] The Commissioner, however, assessed deficiencies in Grove's taxable income for these years,[8] asserting that Grove "realized additional dividends in the amounts of $29,000 and $25,800 in 1963 and 1964, respectively, as the result of the redemption of stock by Grove Shepherd Wilson & Kruge, Inc." Accordingly, the Commissioner increased Grove's taxable income by these amounts and demanded payment of additional taxes—in excess of $13,000— for each year. Grove refused to pay and petitioned the Tax Court for a redetermination of his tax liability. The Court, concluding that Grove had made a bona fide gift to RPI, ruled in favor of the taxpayer and the Commissioner appealed.

## II.

The Commissioner's view of this case is relatively simple. In essence, we are urged to disregard the actual form of the Grove-RPI-Corporation donations and redemptions and to rewrite the actual events ʼso that Grove's tax liability is seen in a wholly different light. Support for this position, it is argued, flows from the Supreme Court's decision in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S. Ct. 707, 89 L.Ed. 981 (1945), which, in language familiar to law students, cautions that "[t]he incidence of taxation depends upon the substance of a transaction. . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Id.* at 334, 65 S.Ct. at 708. In an effort to bring the instant case within this language, the Commissioner insists that whatever the appearance of the transactions here under consideration, their "true nature" is quite different. He maintains that Grove, with the cooperation of RPI, withdrew substantial funds from the Corporation and manipulated them in a manner designed to produce income for his benefit. In the Commissioner's view, the transaction is properly characterized as a redemption by the Corporation of Grove's, not RIP's shares, followed by a cash gift to RPI by Grove.

---

7. In addition, Grove received each year small sums exempt from federal taxation.

8. Portions of each deficiency were based on items unrelated to the gift transactions.

These matters were settled by the parties and were not presented to the Tax Court.

This result, it is said, more accurately reflects "economic reality."

The Commissioner's motives for insisting upon this formulation are easily understood once its tax consequences are examined. Although Grove reported taxable dividends and interest received from the Merrill Lynch account on his 1963 and 1964 tax returns, amounts paid by the Corporation to redeem the donated shares from RPI were not taxed upon distribution. If, however, the transactions are viewed in the manner suggested by the Commissioner, the redemption proceeds would be taxable as income to Grove. Moreover, because the redemptions did not in substance alter Grove's relationship to the Corporation—he continued throughout to control a majority of the outstanding shares—the entire proceeds would be taxed as a dividend payment at high, progressive ordinary-income rates, rather than as a sale of shares, at the fixed, and relatively low, capital gains rate. *See*, 26 U.S.C. § 302; United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970).

Clearly, then, the stakes involved are high. We do not quarrel with the maxim that substance must prevail over form, but this proposition marks the beginning, not the end, of our inquiry. The court in Sheppard v. United States, 361 F.2d 972, 176 Ct.Cl. 244 (1966) perceptively remarked that "all such 'maxims' should rather be called "minims' since they convey a minimum of information with a maximum of pretense." *Id.* at 977 n.9. Each case requires detailed consideration of its unique facts. Here, our aim is to determine whether Grove's gifts of the Corporation's shares to RPI prior to redemption should be given independent significance or wheth-er they should be regarded as meaningless intervening steps in a single, integrated transaction designed to avoid tax liability by the use of mere formalisms.

The guideposts for our analysis are well marked by earlier judicial encounters with this problem. "The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of sale." Carrington v. Commissioner of Internal Revenue, 476 F.2d 704, 708 (5th Cir. 1973), *quoting* Humacid Co., 42 T.C. 894, 913 (1964). As noted below by the Tax Court, the Commissioner here "does not contend that the gifts of stock by [Grove] to RPI in 1961 and 1962 were sham transactions, or that they were not completed gifts when made." If Grove made a valid, binding, and irrevocable gift of the Corporation's shares to RPI, it would be the purest fiction to treat the redemption proceeds as having actually been received by Grove. The Tax Court concluded that the gift was complete and irrevocable when made. The Commissioner conceded as much and we so find.[9]

It is argued, however, that notwithstanding the conceded validity of the gifts, other circumstances establish that Grove employed RPI merely as a convenient conduit for withdrawing funds from the Corporation for his personal use without incurring tax liability. The Commissioner would have us infer from the systematic nature of the gift-redemption cycle that Grove and RPI reached a mutually beneficial understanding: RPI would permit Grove to use its tax-exempt status to drain funds

---

9. The Commissioner might have argued that at least that portion of the redemption proceeds allocable to Grove's retained life income interest was taxable as a dividend. He chose not to do so and the Tax Court "express[ed] no opinion upon the question, if it were properly presented, whether petitioner derived taxable income upon the redemption of stock to the extent of the life estate which he retained . . . ." Since the Commissioner has bypassed this aspect, it would be inappropriate in our discussions of the gifts to attach any special significance to the retained life interest feature.

from the Corporation in return for a donation of a future interest in such funds.

We are not persuaded by this argument and the totality of the facts and circumstances lead us to a contrary conclusion. Grove testified before the Tax Court concerning the circumstances of these gifts. The court, based on the evidence and the witnesses' credibility, specifically found that "[t]here was no informal agreement between [Grove] and RPI that RPI would offer the stock in question to the corporation for redemption or that, if offered, the corporation would redeem it." Findings of fact by the Tax Court, like those of the district court, are binding upon us unless they are clearly erroneous, 26 U.S.C. § 7482(a); Rule 52, F.R.Civ.P., and "the rule . . . applies also to factual inferences [drawn] from undisputed basic facts." Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960). It cannot seriously be contended that the Tax Court's findings here are "clearly erroneous" and no tax liability can be predicated upon a nonexistent agreement between Grove and RPI or by a fictional one created by the Commissioner.

Grove, of course, owned a substantial majority of the Corporation's shares. His vote alone was sufficient to insure redemption of any shares offered by RPI. But such considerations, without more, are insufficient to permit the Commissioner to ride roughshod over the actual understanding found by the Tax Court to exist between the donor and the donee. Behrend v. United States (4th Cir. 1972), 73–1 USTC ¶ 9123, is particularly instructive. There, two brothers donated preferred shares of a corporation jointly controlled by them to a charitable foundation over which they also exercised control. The preferred shares were subsequently redeemed from the foundation by the corporation and the Commissioner sought to tax the redemption as a corporate dividend payment to the brothers. The court, in denying liability, concluded that although "it was understood that the corporation would at intervals take up the preferred according to its financial ability : . . , this factor did not convert into a constructive dividend the proceeds of the redemption . . . [because] the gifts were absolutely perfected before the corporation redeemed the stock." *Id.*

Nothing in the December, 1954, minority shareholder agreement between the Corporation and RPI serves as a basis for disturbing the conclusion of the Tax Court. Although the Corporation desired a right of first refusal on minority shares—understandably so, in order to reduce the possibility of unrelated, outside ownership interests—it assumed no obligation to redeem any shares so offered. In the absence of such an obligation, the Commissioner's contention that Grove's initial donation was only the first step in a prearranged series of transactions is little more than wishful thinking grounded in a shaky foundation. *See* Carrington v. Commissioner of Internal Revenue, *supra*, 476 F.2d at 709; Behrend, *supra*, 73–1 USTC ¶ 9123 at 80,067; Sheppard v. United States, supra at 978; Robert L. Fox, 27 TCM 1001, 1013 (1968).

We are not so naive as to believe that tax considerations played no role in Grove's planning. But foresight and planning do not transform a non-taxable event into one that is taxable. Were we to adopt the Commissioner's view, we would be required to recast two actual transactions—a gift by Grove to RPI and a redemption from RPI by the Corporation—into two completely fictional transactions—a redemption from Grove by the Corporation and a gift by Grove to RPI. Based upon the facts as found by the Tax Court, we can discover no basis for elevating the Commissioner's "form" over that employed by the taxpayer in good faith. "Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so an additional tax liability might be assert-

ed." Sheppard v. United States, *supra,* at 978. In the absence of any supporting facts in the record we are unable to adopt the Commissioner's view; to do so would be to engage in a process of decision that is arbitrary, capricious and ultimately destructive of traditional notions of judicial review. We decline to embark on such a course.

Accordingly, the judgment of the Tax Court is affirmed.

OAKES, Circuit Judge (dissenting):

Review of the tax consequences of a business transaction requires consideration of the economic realities of the entire transaction. *See* Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); South Bay Corp. v. Commissioner of Internal Revenue, 345 F.2d 698, 703, 705 (2d Cir. 1965). Whether a transaction should be viewed as two or more steps or as one integrated transaction may result in entirely different tax consequences. *See generally* B. Bittker & J. Eustice, Federal Taxation of Corporations and Shareholders ¶ 1.05 at 1–19 through 1–21 (3rd ed. 1971); Mintz & Plumb, Step Transactions in Corporate Reorganizations, N.Y.U. 12th Inst. on Fed.Tax. 247 (1954); *cf.* Treas.Reg. § 1.351–1(c)(2) & (5) (1967) ("existing plan" and subsequent steps "however delayed").

Here, as I see it, the form of the transaction was two-step: a gift of stock followed by a redemption of the stock by the donor controlled corporation. The substance of the transaction, however, was a payment out of corporate earnings and profits to a charity designated by the donor who retained a life interest in the gift.[1]

The factors which distinguish the RPI-Grove transactions from other charitable donations of securities and which persuade me to treat this as an integrated transaction are two: first, the gifts made by the Groves were of stock in a closed corporation that was inevitably redeemed annually; second, by virtue of retaining a life income from the reinvested proceeds and by retaining a measure of control over how those proceeds should be reinvested (by designating the investment adviser who was also the Groves' personal adviser), the Groves were able to achieve a bail-out from their non-dividend-paying closed corporation.

Viewing the economic realities of the situation, the pattern of redemption always following upon the gifts makes it clear that by the tax years here in issue Grove could confidently expect that RPI would quickly redeem and reinvest the Grove stock in safe income bearing securities. From the time Grove first began giving RPI shares in 1955, until 1964 when Grove was assessed with the taxes here in dispute, RPI consistently and without exception offered for redemption the Grove shares approximately one year after they were received. Not only was the practice consistent, thus indicating that at least as of 1963 the Groves could count on annual redemption offers, but it was the only practice which a university treasurer could correctly take and still meet his own statutory obligations as a fiduciary to RPI. *See* N.Y. Estates, Powers and Trust Law § 11–2.1 & .2 (McKinney 1967 & Supp. 1972). As pointed out in the majority opinion, construction company stock may be quite risky. Given the relatively conservative nature of university investments, it

1. Courts have frequently dealt with the substance-form dilemma in a charitable gift context and found against the taxpayer, though not in situations specifically like this one. *Cf.* Parmer v. Commissioner of Internal Revenue, 468 F.2d 705 (10th Cir. 1972); Tatum v. Commissioner of Internal Revenue, 400 F.2d 242 (5th Cir. 1968) (donor-taxpayer held to have realized income upon the later collec- tion by the donee charity of income due on assigned rights to shares of crops produced by the donor's tenants). *See also* Friedman v. Commissioner of Internal Revenue, 346 F.2d 506 (6th Cir. 1965) (donor-taxpayer held to have realized income upon the collection by a charity of endowment policy interest payable shortly after the policy was transferred to the charity).

would have been obvious to Grove from the beginning that RPI's treasurer (pursuant to direction from the finance committee of the RPI board of trustees) would redeem the Grove shares quite soon after their receipt. RPI was required as a condition to the gifts to offer any Grove shares to the Grove corporation for redemption prior to resale elsewhere. Grove as majority shareholder had control over whether the shares would be redeemed by the corporation. Thus it is entirely unimportant that there was no written agreement requiring that RPI offer its Grove stock for redemption. Judge Learned Hand observed in Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570, 572 (2d Cir. 1949) (dictum), cert. denied, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589 (1950), that the "sure expectation" of a later transaction might be sufficient to bring a transaction within the principle enunciated in Gregory v. Helvering, *supra*.[2] There surely was a "sure expectation" of redemption here. It did not become any the less sure when Grove became a term trustee of RPI in 1957, and subsequently a life, and then an honorary trustee.

Moreover, the reinvestment which took place gave the Groves a life interest in an entirely different sort of security than they had had as owners of the shares of Grove Shepherd Wilson & Kruge, Inc.—thus accomplishing a financially desirable diversification and creating a dependable interest and dividend flow. Their closed corporation paid no dividends during the period here in question, although it could have done so. *See* Edgar v. Commissioner of Internal Revenue, 56 T.C. 717, 758–759 (1971); Security First National Bank v. Commissioner of Internal Revenue, 28 B.

T.A. 289, 310–11 (1933); Rev.Rul. 68–658, 1968–2 Cum.Bull. 119. The fact that Grove could depend on RPI's investment of the Grove shares in stocks and bonds paying substantial dividends and interest is clear. Indeed, he selected the investment firm advising RPI on such reinvestment. This firm also personally advised him, and RPI acknowledged in writing as early as 1955 that it was pleased to conform to Grove's wishes, to have the investment of the redemption proceeds coordinated with Grove's personal investment program. The investment firm could be expected to act, and did in fact act as far as the record indicates, to make investments which provided good yearly income to Grove as well as a safe capital base for RPI.[3]

If Grove had given RPI listed "safe" securities equivalent to those invested in by Scudder, Stevens & Clark to RPI rather than the risky construction company stock he would have received no benefit from these transactions (other than the gift tax deduction). But in this case his gifts acted as a sort of low risk pension fund for himself and his wife in case of failure of the construction business, without his having to pay a tax on any dividends that might be declared by his corporation. The Groves were in the very same financial position after the gift-redemption-reinvestment transaction as if the corporation had paid them a cash dividend in the amount of the gift, a dividend which they had then given to RPI to be reinvested safely. The Groves maintained their position as controlling shareholders. *Cf.* United States v. Davis, 397 U.S. 301, 313, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). Finally, the corporation was also in the same financial position as if it had declared and paid a cash dividend

---

2. Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps.

The doctrine derives vitality, rather, from its application where the form of a transaction *does not require* a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset. King Enterprises, Inc. v. United States, 418 F.2d 511, 518, 189 Ct.Cl. 466 (1969).

3. The investment income was $9,636.86 of interest and dividends in 1964 and $7,475.01 in 1963.

since it redeemed the shares of stock for cash (except that on redemption it was better off in that it rather than the Groves owned its shares redeemed). But a tax on the amount of the dividend, had one been declared, had—hopefully for corporation and shareholder alike— been avoided and under the majority decision was in fact avoided.

The majority opinion relies heavily on two cases which I believe are readily distinguishable from the situation here. One is Carrington v. Commissioner of Internal Revenue, 476 F.2d 704 (5th Cir. 1973), relied on for the proposition that "[a] gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title before the property gives rise to income by way of sale." Here the Groves did *not* part with all interest in the construction company stock. The reservation of a life interest in the stock (or its reinvested proceeds), when coupled with taxpayer's right, however indirect, to direct the manner in which proceeds would be invested, gave the Groves a very great continuing interest and control, a fact of not inconsiderable tax significance. *Cf.* Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930) (Holmes, J.) ("taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed. . . ."). More importantly, *Carrington* involved only one contribution of stock and one redemption; there was no pattern of redemption of stock as was clearly established here at least by the time of the tax years in question.

In Behrend v. United States, CCH 1973 Stand.Fed.Tax Rep. ¶ 9123 (4th Cir. 1972), also relied upon by the majority, the proceeds of the redemption were used wholly for the benefit of the charitable foundation which was the recipient of the stock; there was no life estate reserved for the personal benefit of the donors. *See* 1973 Stand.Fed.Tax Rep. ¶ 9123 at 80,067 ("[P]redominant force" in *Behrend* decision is "indisputable fact" that the taxpayers therein "did not participate whatsoever in the beneficence of the foundation").

Thus, I believe that when, as here, the nature and conditions of the charitable gift and the pattern of donor-charity behavior are such as to make it for all practical purposes inevitable that the stock given will be offered for redemption and accepted by the closely held corporation, resulting in providing the equivalent of a safe pension fund for the donor stockholders, then the transaction must be treated as a distribution of dividends under §§ 301(a), 301(c) and 316(a) of the Internal Revenue Code of 1954. The majority opinion refers to an "absence of any supporting facts in the record" for the Commissioner's position, but omits to rely upon the one most important fact on which the case should turn: the *pattern of redemption* over years of giving. I accordingly dissent.