T.C. Memo. 2013-109

UNITED STATES TAX COURT

BARNES GROUP, INC. AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27211-09.                    Filed April 16, 2013.

Robin Lee Greenhouse, James Riedy, and Nathaniel J. Dorfman, for
petitioners.

Stephen C. Best and William T. Derick, for respondent.

**[\*2]**       MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined the following deficiencies and

section 6662(a)[1] accuracy-related penalties with respect to petitioners' Federal

income tax:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|---------------------|
| 1998 | [1]$176,279 | $35,256 |
| 2000 | 1,304,352 | 1,733,084 |
| 2001 | 1,807,478 | 307,735 |

[1]Respondent disallowed petitioners' net operating loss carryback of $503,654 from its 2000 tax year.

The issues for decision are:

(1) whether Barnes Group, Inc. (Barnes),[2] should have included in gross

income $38,919,950 and $19,378,596 for 2000 and 2001, respectively, under

sections 951(a)(1)(B) and 956 or under section 301 as a result of a series of

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]For Federal income tax purposes, Barnes is the common parent of the affiliated group Barnes Group, Inc. & Subs.

[*3] transactions between Barnes and its subsidiaries.  We hold that Barnes should have included the amounts in gross income under section 301;

(2) whether the fair market value of "clean rooms" transferred to Barnes in 2001 should be excluded from its income under section 109.  We hold that the value of the clean rooms should not be excluded from income; and

(3) whether petitioners are liable for the section 6662(a) accuracy-related penalty for the years in issue.  We hold that they are liable for the section 6662(a) penalty for all years in issue.

## FINDINGS OF FACT

At the time the petition was filed Barnes was a publicly traded Delaware corporation that maintained its principal place of business in Connecticut.[3]

## I. Business Operations

Founded in 1857, Barnes manufactures and distributes precision metal parts and industrial supplies.  By 1999 Barnes operated three separate business segments through its domestic and foreign subsidiary corporations--Associated Spring, Barnes Aerospace, and Barnes Distribution.  These three business segments had significant operations in the United States, Canada, Europe, Latin

---

[3]The parties agree that this case is appealable to the Court of Appeals for the Second Circuit.

[*4] America, and Asia.  Associated Spring manufactures precision mechanical and

nitrogen gas springs.  Barnes Aerospace manufactures and repairs aircraft engine

and airframe components.  Barnes Distribution distributes maintenance, repair, and

operating supplies.

II.  Overview of Events

We must address two unrelated events in this case.  The first concerns the

Agreement and Plan of Reinvestment (reinvestment plan or plan) executed between

Barnes and its subsidiaries in 2000 and 2001.  The second concerns an agreement to

construct six "clean rooms" executed in 1985 between Barnes and International

Business Machines Corp. (IBM).[4]

---

[4]The parties dispute whether sec. 109 applies to the receipt of the clean rooms
as well as the value of four of the clean rooms. The parties agree to the following
procedure to resolve the sec. 109 applicability and valuation issue:

(a)  The Section 109 Issue will be submitted by the parties on a
stipulated record to the Court for decision.  This stipulated record will
include the pertinent agreements executed by IBM and * * * [Barnes]
and any additional background facts necessary to resolve the Section
109 Issue.

(b)  If Petitioners do not prevail with respect to the Section 109
Issue, Petitioners and Respondent agree that the value of the four
10,000 PPM clean rooms was $2,110,000 on March 31, 2001; that the
value of the two 100,000 PPM clean rooms was $850,000; and that the
value of the other property was $765,850.  Thus, if Petitioners do not
prevail with respect to the Section 109 Issue,  Petitioners must include

(continued...)

**[\*5]** III.  Events Leading to the Reinvestment Plan

The reinvestment plan was executed as a result of a series of events arising from Barnes' strategic objective to expand the company primarily through acquisitions.   In accordance with Barnes' strategic objective:  (1) Barnes hired new management (new management team) with strong backgrounds in growing companies and extensive experience with domestic and international acquisitions; and (2) made several acquisitions (early acquisitions) totaling approximately $200 million.

A.  New Management Team

Between 1998 and the first quarter of 2000 Barnes replaced the majority of its executive officers as part of its strategic objective to expand the company. While the individuals most relevant to the reinvestment plan will be discussed in more detail below, in 2000 and 2001 Barnes' officers included:   Edmund Carpenter--president and chief executive officer; William Denninger[5]--senior vice

---

[4](...continued)
in income in 2001 the value of all such property ($3,725,850).
        (c)  Regardless of whether Petitioners prevail with respect to the Section 109 Issue, Petitioners must include in income in 2001 the value of the other property received ($765,850).

[5]Mr. Denninger was responsible for approving significant long-term

(continued...)

[*6] president, finance, and chief financial officer; Signe Gates–senior vice president, general counsel, and secretary; Francis Boyle--vice president, controller; Joseph DeForte--vice president, tax; Phillip Goodrich--senior vice president, corporate development; and John Locher[6]--vice president, treasurer.

B.  Early Acquisitions

Before 1999 Barnes had not completed an acquisition for the better part of a decade.  As part of the new expansion objective, the new management team engaged an outside consultant for assistance in identifying strategic growth areas for Associated Spring's business segment.  The analysis and work product generated by the consultant provided Barnes with the necessary data and confidence to pursue an aggressive acquisition program specifically directed at Associated Spring's electronics business in Asia and Europe.

Barnes made three significant acquisitions during 1999 and 2000 totaling $197.1 million:  (1) August 1999--Barnes acquired the nitrogen gas springs business of Teledyne Fluid Systems Division of Teledyne Industries, Inc., for

---

[5](...continued)
investments by any of Barnes' offshore operations.

[6]John Locher was Barnes' vice president and treasurer in 2000 and 2001 until his February 2001 retirement.  Lawrence O'Brien was hired for the position thereafter.

[*7] $92.2 million; (2) May 2000--Barnes acquired Curtis Industries, Inc., for $63.3 million; and (3) September 2000--Barnes acquired AVS/Kratz-Wilde Machine Co. and Apex Manufacturing, Inc., for $41.6 million.[7]

C. Result of Early Acquisitions

At the end of 1998 before the acquisitions began, Barnes had approximately $50 million of outstanding long-term indebtedness and no outstanding balance on a revolving credit line. By the end of 2000 Barnes had approximately $230 million of outstanding long-term indebtedness including approximately $50 million due on its revolving credit line. This increase in debt transformed Barnes from a relatively low-leveraged firm to a firm with significantly above-average leverage for companies within the industrial equipment and components industries. The early acquisitions also increased Barnes' cost of borrowing and debt-to-equity ratio.[8]

---

[7]Barnes also made two relatively smaller acquisitions in 2001: (1) January 2001--Barnes acquired Euro Stock Springs & Components Ltd. for $708,000; and (2) November 2001--Barnes acquired certain assets of Forward Industries for $2.5 million.

[8]Barnes' debt-to-equity ratio increased from .30 to 1.15.

**[*8]** D. The Predicament

As of May 31, 2000, Barnes and its subsidiaries collectively had $45.2 million of cash worldwide--Barnes and its domestic subsidiaries held $1.5 million and Barnes' foreign subsidiaries held the remaining $43.7 million.

Associated Spring-Asia PTE Ltd. (ASA), a Singapore corporation and second-tier Barnes subsidiary, conducted operations for Barnes' Associated Spring division in Southeast Asia. During the late 1990s ASA generated significant profits.[9] As of September 1, 2000, ASA had approximately $12.9 million of existing cash reserves held in short-term accounts and approximately $26.1 million of cash receivables from foreign affiliates. ASA was generating cash in excess of its immediate operating needs, allowing ASA to borrow funds from the Development Bank of Singapore Ltd., an unrelated third-party bank (Singapore Bank), at a preferential interest rate.

Accounting for all of the bank deposits held by Barnes' domestic and foreign subsidiaries, Barnes was earning approximately 3% interest on its aggregate cash and short-term investment holdings. Conversely, Barnes' 2000 annual report indicated that Barnes had external borrowings with interest rates

_____

[9]Barnes reported that ASA had untaxed accumulated earnings and profits of $80,082,311, $91,458,630, and $93,420,851 as of January 1, 2000, December 31, 2000, and December 31, 2001, respectively.

**[*9]** ranging from 7.13% to 9.47%. While ASA was permitted to make short-term money market style investments, other investments by ASA required approval from Barnes' CFO or treasurer.

Consistent with Barnes' growth by acquisition strategy, Barnes sought to use ASA's excess cash and borrowing capacity to finance one or more international acquisitions; however, no suitable targets had been identified during the late 1999 to early 2000 period.[10] As a result, ASA's excess cash remained invested in short-term deposit accounts earning approximately 3% while Barnes was incurring debt at borrowing rates in excess of 7%. Barnes understood that either a dividend or a loan from ASA to Barnes would trigger a Federal tax liability.[11]

IV.  The Search for a Solution

Mr. DeForte (Barnes' vice president, tax) was one of the primary players involved with the reinvestment plan. At the time of his hiring, Mr. DeForte had over 20 years of experience with large multinational corporations as an international tax accountant (Pfizer Corp. and Johnson & Johnson), an

---

[10] If a suitable acquisition had been identified, it would have taken over a year to complete the transaction.

[11] Furthermore, Barnes was in an overall "foreign loss position" as defined in sec. 904(f) and therefore was not in a position to fully use foreign tax credits.

[*10] international tax manager (ITT Sheraton Corp.), and a vice president, tax (Millipore Corp. and Loctite Corp.).[12] He worked on corporate acquisitions at various times throughout his career.

Upon arriving at Barnes, Mr. DeForte met with key personnel in the treasury, legal, and accounting departments to identify potential corporate opportunities, existing pitfalls, prior strategies, and the valuable assets and operations of Barnes' three business segments. Mr. DeForte first learned of the aforementioned predicament in late 1999 during a meeting with Barnes' assistant treasurer, David Sinder.[13]

Mr. DeForte first contacted Ernst & Young (E&Y) and Deloitte & Touche (Deloitte) for assistance in addressing the predicament. Specifically, Barnes sought a way to (a) "arbitrage" the interest rate differential, (b) without incurring Federal income tax, (c) while retaining the foreign funds for overseas investment

---

[12]Mr. DeForte was also the chief financial officer (CFO) of Loctite Corp. As CFO he had broad oversight over the treasury, financial, and tax operations of the company.

[13]Mr. Sinder was employed by Barnes from 1986 until 2010. As Barnes' assistant treasurer, he was responsible for short-term cash management for the domestic companies in Barnes' consolidated group.

[*11] opportunities. After rejecting the ideas proposed by E&Y and Deloitte, Mr.

DeForte contacted Dennis Lubozynski, a tax partner at PricewaterhouseCoopers

(PwC).[14]

Barnes had been a client of PwC since 1993. From 1993 through the time of

trial, PwC provided Barnes with audit and tax advisory services. At the time Mr.

DeForte contacted PwC for assistance, PwC had been providing these services to

Barnes for over seven years.

After receiving the request for assistance, PwC reviewed its Ideasource

database[15] and spoke with several professionals around the firm to determine what

ideas would be available to meet the needs of Barnes. PwC proposed several

solutions. After some followup meetings between members of Barnes' tax

department and PwC professionals, Barnes decided to construct a domestic and

---

[14]Before joining Barnes, Mr. DeForte had significant work experience with PwC professionals, including Mr. Lubozynski and Paul Coneys. Mr. Coneys was the initial PwC tax professional assigned to Barnes in 1993.

[15]During the late 1990s all PwC tax professionals were encouraged to submit their experiences and ideas to a database. The information was entered in the database in a way that did not reveal client-identifying information so that the entries were suitable for sharing with other PwC professionals.

[*12] foreign finance structure[16] as a solution to its predicament.  This structure eventually developed into the reinvestment plan.

## V.  The PwC Engagement Letter

Barnes and PwC executed an engagement letter that identified the scope of services to be provided by PwC as well as the agreed-upon fee arrangement.  The terms of the engagement letter were negotiated between Mr. DeForte and Mr. Lubozynski.

The scope of the services to be performed by PwC included--

[D]esigning an appropriate * * * [reinvestment plan]; working closely with personnel of * * * [Barnes] and its subsidiaries to implement the * * * [reinvestment plan]; and providing tax opinions in the countries with subsidiaries affected by the * * * [reinvestment plan] (anticipated to be Singapore, Canada, United States and one other tax jurisdiction).  * * *

Services provided in Singapore will include all tax and legal services needed to implement the * * * [reinvestment plan].  These services will include preparation of legal documents, share registration documents and a tax and legal opinion on the Singapore tax implications of the * * * [reinvestment plan].

The fee arrangement included in the engagement letter had two components.

The first component required Barnes to pay 70% of PwC's standard hourly rates

---

[16]The domestic and foreign finance structure was similar to a structure described in Ideasource entry 1365.  Ideasource entry 1365 was added to the database in June 1996 by a tax professional at PwC.

[*13] during the course of the engagement. The second component of the fee

arrangement, to be paid at the end of the engagement, was based on an agreement

between Barnes and PwC regarding the quality of the services provided by PwC.

Specifically, the engagement letter listed multiple factors to be considered in

determining the second component of the fee arrangement--

> The second component will be a fee at the completion of the
> engagement based on an agreement at that time between PwC and
> * * * [Barnes] as to the quality of the services provided hereunder.
> This determination will be an assessment determined by mutual
> agreement, based on a number of factors, including but not limited to,
> (i) the complexity of the matters which are the subject of this
> engagement, (ii) the creativity of the advice provided by PwC, (iii)
> the effort expended in rendering the professional services, and (iv)
> the value added to * * * [Barnes] by PwC.

The total amount Barnes paid PwC in connection with the reinvestment plan

is unclear from the record. Barnes submitted numerous billing statements totaling

roughly $463,000; however, the only billing statement reconciling prior billing

was a billing statement "for professional services rendered through September 30,

2000". Most of the billing statements indicated that they were for "professional

services" or a "progress bill" related to the "Treasury Assistance Project". A

$2,886 bill in the record was paid for PwC employee hours worked.[17] The final

---

[17]The reconciling billing statement mentioned supra indicated that prior billing
was for "time incurred since inception of project"; however, it did not provide the
(continued...)

**[*14]** bill for "tax consultation" regarding the "Treasury Assistance Project" was for professional services through July 31, 2001.

## VI.  Developing the Reinvestment Plan

Barnes and PwC spent three to four months over the summer of 2000 working together on developing the transaction structure for the reinvestment plan. The PwC professionals assigned to assist Barnes (PwC project team) were in the United States, Singapore, Canada, France, and the United Kingdom; however, Mr. Coneys was the project leader, and Mr. Lubozynski was the initial engagement partner.  The PwC project team were technical specialists responsible for the day-to-day work on the reinvestment plan.  In addition to Mr. DeForte, several other Barnes officers and employees participated in developing the reinvestment plan.

On April 6, 2000, Mr. DeForte sent an email to Mr. Denninger giving him a brief summary of the proposed method to transfer cash from ASA to the United States without a tax liability:  (1) Barnes creates a domestic financing entity; (2) ASA creates a foreign financing entity; (3) ASA exchanges its cash for the foreign financing entity's stock; and (4) the foreign financing entity transfers the cash and

---

[17](...continued)
amount of time.

[*15] its stock to the domestic financing entity in exchange for the domestic financing entity's stock.

Later that month Mr. DeForte emailed Mr. Denninger several possible "enhancements" to the plan, including the possibilities of involving other foreign subsidiaries and/or additional capital from a third-party loan. He concluded the email with his recommendation that Barnes go forward with the plan.

On May 5, 2000, PwC provided Mr. DeForte with the following: (1) an "exit strategy" to "unwind" the reinvestment plan in the event Barnes sought to return the funds to ASA; and (2) a "draft" of a "business purpose" for the reinvestment plan. The recommended exit strategy involved the foreign financing entity's purchasing the domestic financing entity's stock from Barnes and then liquidating the domestic financing entity. The business purpose draft contained several broad statements of general applicability on international cash management. Moreover, the draft included "XXXXX" in place of a company name and listed the company as a "multinational transportation company".[18]

---

[18]Barnes provided a "business purpose" document to PwC in July 2000. The document stated substantially the same business purposes as the draft originally sent by PwC; however, Barnes added further background information and changed the company's business from "multinational transportation company" to "multinational manufacturing and distribution company".

[*16]  On July 7, 2000, Mr. DeForte provided PwC with a "cost benefit analysis of the repatriation project".  The analysis assumed that the reinvestment plan would be "unwound" after 15 years but claimed not to take into account the tax savings from repatriating the funds in year 1 "since * * * [Barnes] would not do it if there was a tax cost."  The analysis concluded that the plan would provide a net benefit of approximately $2.1 million.

PwC and Barnes worked on many other preimplementation steps through August 2000, including:  (1) identifying the foreign and domestic financing entities, the jurisdiction for the foreign financing entity, and which subsidiaries would contribute to the foreign financing entity; (2) discussing and planning for foreign tax and nontax issues, including Singapore corporate law,[19] Singapore tax law, and Canadian tax law; (3) drafting a representation letter[20] and an opinion letter; and (4) drafting the board of directors resolutions that would ratify the

---

[19]In a PwC memo regrading the "Singapore tax consequences of the * * * [reinvestment plan]", there is a brief discussion on Singapore corporate law.  The memo states that sec. 21 of the Singapore Companies Act does not allow a subsidiary to hold shares of its Singapore parent.

[20]The first draft of the representation letter was prepared by PwC and subsequently provided to Barnes for review.  Barnes' CFO and other officers and employees reviewed the draft representation letter for accuracy.  After they concluded that the representation letter was accurate in every respect, it was signed by Barnes' CFO on December 6, 2000.

[*17] reinvestment plan. Barnes' board of directors ratified the reinvestment plan on October 12, 2000.

VII. Summary of the Reinvestment Plan

Barnes and three of its subsidiaries were explicitly included in the reinvestment plan--(1) ASA, mentioned supra; (2) Barnes Group Finance Co. Delaware (Delaware), a Delaware corporation; and (3) Barnes Group Finance Co. Bermuda Ltd. (Bermuda), a Bermuda corporation. Additionally, three other Barnes subsidiaries played a role in the plan--(1) Barnes Group Canada Inc. (Barnes Canada); (2) Bowman Distribution Europe Ltd. (Bowman UK); and (3) Bowman Distribution France S.A. (Bowman France). The plan was structured so that Barnes would receive ASA's excess cash, ASA's receivables from foreign affiliates, and the proceeds of a loan from the Singapore Bank.

A. Receivables From Foreign Affiliates[21]

While not explicitly mentioned in the reinvestment plan document, Barnes Canada, Bowman UK, and Bowman France played a role in the plan. ASA's "receivables from foreign affiliates" related to Bowman UK and Bowman France;

---

[21]The record lacks conclusive evidence of the precise series of events between Barnes, Barnes Canada, Bowman UK, and Bowman France; however, this section provides an approximate account of what occurred.

[*18] however, neither had the funds to repay its respective loan.[22]  Therefore,

Barnes planned to have Barnes Canada make equity investments in the foreign

affiliates, and then the foreign affiliates would repay their loans to ASA.

Nonetheless, on account of purported "foreign asset passive income" and

"debt/equity" considerations, Barnes initially lent the funds to Bowman UK and

Bowman France.  At some time around the execution of the reinvestment plan, ASA

collected its receivables from Bowman UK and Bowman France.  Thereafter,

Barnes Canada made the alleged equity investments in Bowman UK and Bowman

France, and Bowman France and Bowman UK repaid the loans from Barnes.

B.  The Structure of the Plan

For purposes of implementing the reinvestment plan, Barnes formed

Bermuda and Delaware as wholly owned subsidiaries on August 29 and

September 12, 2000, respectively.[23]  At the time the plan was implemented,

Bermuda and Delaware were wholly owned subsidiaries of Barnes, and ASA was

---

[22]Bowman UK and Bowman France owed ASA $15,750,000 and $3,800,000, respectively.

[23]Thereafter, on September 20, 2000, Delaware issued 500 shares of its common stock to Barnes in exchange for Barnes' transfer of $5 to Delaware.  Then on September 28, 2000, Bermuda issued 12,000 shares of its common stock to Barnes in exchange for Barnes' transfer of $12,000 to Bermuda on December 4, 2000.

[*19] a second-tier subsidiary[24] of Barnes. During 2000 and 2001 Bermuda and ASA were controlled foreign corporations within the meaning of section 957(a).

The reinvestment plan was structured to occur in two parts, and both parts were structured to involve a similar series of transactions. Part I was structured to occur in the following order: (1) in a section 351 transaction[25] ASA and Barnes would transfer foreign currency to Bermuda in exchange for Bermuda common stock; (2) in another section 351 transaction Bermuda and Barnes would transfer foreign currency and Bermuda common stock to Delaware in exchange for Delaware stock (Barnes would receive common stock and Bermuda would receive preferred stock); and (3) Delaware would convert the foreign currencies into U.S. dollars and then lend the funds to Barnes.

The main difference with part II of the reinvestment plan was that ASA would first borrow funds from the Singapore Bank before completing the aforementioned series of section 351 transactions. After completion of the plan,

---

[24]Barnes owned 100% of the stock of an entity which in turn owned 100% of the stock of ASA.

[25]Sec. 351(a) provides for the nonrecognition of gain or loss upon the transfer by one or more persons of property to a corporation solely in exchange for stock in the corporation, if immediately after the exchange the person or persons are in control of the corporation to which the property was transferred.

[*20] ASA and Delaware would own all of the common stock of Bermuda and Bermuda would own all of the preferred stock of Delaware.

## VIII. Executing the Reinvestment Plan

The boards of directors of ASA, Bermuda, and Delaware all formally approved the reinvestment plan.  On December 6, 2000, Barnes, ASA, Bermuda, and Delaware executed the plan.[26]  As structured, the reinvestment plan was implemented in two parts--the first part was implemented in December 2000 and the second part in July 2001.

### A.  Part I of the Reinvestment Plan

On December 7, 2000, Bermuda issued 222,000 shares of its common stock to Barnes in exchange for Barnes' transfer of 384,171 Singapore dollars (equivalent to $222,000) to Bermuda on or about December 15, 2000.  Also on December 7, 2000, Delaware issued 3,184 shares of its common stock to Barnes in exchange for Barnes' transfer to Delaware of:  (1) 234,000 shares (100%) Bermuda common stock issued on December 7, 2000; and (2) 5,137,425 Singapore dollars (equivalent to $2,951,000) paid on or about December 19, 2000.

---

[26]The reinvestment plan was amended on March 29 and June 21, 2001, to provide ASA with the additional time necessary to close the loan with the Singapore Bank.

[*21] Next, on or about December 12, 2000, Bermuda issued 39 million shares of its common stock to ASA in exchange for ASA's aggregate transfer to Bermuda of 67,720,713 Singapore dollars (equivalent to $39 million) on or about December 12 and 18, 2000. Thereafter, on December 22, 2000, Bermuda transferred approximately 68,104,884 Singapore dollars (equivalent to $39,222,000)[27] and 2,950,000 shares of Bermuda common stock to Delaware in exchange for Delaware's issuance of 42,172 shares of Delaware preferred stock to Bermuda. Four days later on December 26, 2000, Delaware converted 73,242,309 Singapore dollars to $42,114,815. Delaware then transferred $42,105,000 to Barnes structured as a loan, and Barnes in turn used the funds to pay off its own debt.[28]

B. Part II of the Reinvestment Plan

Several events occurred on or around July 2, 2001, in compliance with the reinvestment plan: (1) ASA borrowed 3 billion Japanese yen from the Singapore

---

[27]The $39,222,000 included the $39 million ASA transferred to Bermuda in December 2000 and the $222,000 Barnes transferred to Bermuda in December 2000.

[28]The $42,105,000 included the $39,222,000 Bermuda transferred to Delaware in December 2000 and the $2,950,000 Barnes transferred to Delaware in December 2000.

[*22] Bank;[29] (2) Bermuda issued 23,246,400 shares of common stock to ASA in exchange for ASA's transfer of 2.9 billion Japanese yen (equivalent to $23,311,897) to Bermuda; (3) Bermuda issued 131,000 shares of its common stock to Barnes in exchange for Barnes' transfer of 16,342,315 Japanese yen (equivalent to $132,112) to Bermuda on or about July 3, 2001; and (4) Delaware issued 1,881 shares of its common stock to Barnes in exchange for Barnes' transfer of 131,000 shares of Bermuda common stock and 218,313,373 Japanese yen (equivalent to $1,753,521) to Delaware. Thereafter, on or about July 9, 2001, Bermuda transferred approximately 2,916,342,315 Japanese yen (equivalent to $23,444,009) and 1,750,000 shares of its common stock to Delaware in exchange for Delaware's issuance of 25,127 shares of Delaware preferred stock to Bermuda.[30] The following day Delaware converted 3,134,655,688 Japanese yen to

---

[29] ASA borrowed the funds pursuant to a "Facility Agreement" between ASA and the Singapore Bank dated June 19, 2001. The interest rate on the Singapore Bank loan was 2.15% with an effective rate of approximately 5.15% after accounting for a yen/Singapore dollar hedge executed by ASA with the Singapore Bank. Barnes guaranteed the loan.

[30] The $23,444,009 included the $23,311,897 ASA transferred to Bermuda in July 2001 and the $132,112 Barnes transferred to Bermuda in July 2001.

[*23] $25,197,136.  Delaware then transferred $25,500,000 to Barnes, structured as a loan, and Barnes in turn used the funds to pay off its own debt.[31]

IX.  Bermuda and Delaware

As mentioned, Bermuda and Delaware were formed for the purposes of participating in the reinvestment plan.

A.  Bermuda

Bermuda had no income or deductions for 2000 and nominal amounts of income and deductions for 2001.[32]  Accordingly, Bermuda had no earnings and profits as of December 31, 2000 or 2001.  Bermuda had no paid employees in 2000 and 2001 and had $12,000 and $10,590 of cash at the end of 2000 and 2001, respectively.

Bermuda's board of directors included Mr. Sinder (Barnes' assistant treasurer), Mr. Denninger (Barnes' senior vice president, finance, and CFO), and Mr. Locher (Barnes' vice president, treasurer).  Mr. Sinder was also Bermuda's treasurer.  In accordance with instructions from Barnes' senior management, Mr.

---

[31]The $25,500,000 included the $132,112 initially transferred from Barnes to Bermuda, the $23,311,897 initially transferred from ASA to Bermuda, and the $1,753,521 Barnes transferred to Delaware in July 2001.

[32]In 2001 Bermuda reported $12,000 of revenue from a "foreign exchange gain" and a $13,410 deduction from "outside services".

[*24] Sinder:  (1) signed many if not all of Bermuda's corporate documents in order to implement the reinvestment plan, including the reinvestment plan itself and the two amendments to the plan; and (2) was responsible for the movement of all cash under the reinvestment plan, although he was not sure why each movement of cash was necessary to accomplish the overall purpose of the plan.

### B.  Delaware

Similar to Bermuda's, Delaware's board of directors consisted of Mr. Sinder, Mr. Denninger, and Mr. Locher.  Like Bermuda, Delaware had no paid employees and nominal amounts of cash in 2000 and 2001.  Furthermore, Delaware's financing function appears to have been limited to the currency conversions and subsequent lending transactions with Barnes.  During 2000 and 2001 Delaware reported only a foreign currency exchange loss and a foreign currency exchange gain, respectively.

### 1.  Delaware Preferred Stock

The Delaware preferred stock issued in connection with the reinvestment plan was referred to in Delaware corporate records as "Series A Cumulative Preferred Stock" with a stated value of $1,000 per share.  The holders of such shares were entitled to receive, when and if declared by the board of the directors, quarterly cumulative dividends at a rate of 7.4% of the stated value per annum.

**[*25]** The preferred shares were not convertible into any other class of stock and had no voting rights.

Delaware filed Forms 1042, Annual Withholding Tax Return for U.S. Source Income of Foreign Persons, for tax years 2002, 2004, 2006, 2008, and 2009. The Forms 1042 reported total gross income paid to Bermuda of $7,471,566[33] and total Federal tax withheld of $2,241,469. After learning respondent's position toward the reinvestment plan, Bermuda filed Forms 1120-F, U.S. Income Tax Return of a Foreign Corporation, for its 2002, 2004, 2006, and 2008 tax years. The returns were filed on a "protective claim basis only"--in the event respondent's position was upheld, Bermuda wanted to toll the statute of limitations to apply for a refund of the Federal tax withheld on the preferred dividend payments.

### 2. Delaware Loans

The loans from Delaware to Barnes (Delaware loans) were evidenced by "Inter-Company Loan Agreement #1" and "Inter-Company Loan Agreement #2"

---

[33]The Forms 1042 reported the following gross income paid to Bermuda: 2002--$1,245,261; 2004--$1,245,261; 2006--$1,245,261; 2008--$1,245,261; and 2009--$2,490,522. Nonetheless, it is unclear whether Delaware actually paid the preferred dividends to Bermuda.

**[\*26]** dated December 26, 2001,[34] and July 10, 2001, respectively. Corresponding notes were attached to the Delaware loan agreements, dated December 26, 2000, and July 10, 2001, respectively. Each note was signed by Mr. O'Brien sometime after he was hired as Barnes' vice president and treasurer in August 2001. Barnes and Delaware recorded the Delaware loans in their financial statements as notes payable and notes receivable, respectively.

The Delaware loan agreements allowed the lender to demand full repayment of principal and interest at any time and permitted the borrower to make partial repayments of principal at any time; however, the borrower was required to make annual interest payments on the unpaid principal balance at a fixed rate equal to 7.5% commencing on December 1, 2002. As mentioned, the Delaware loans were made for $42,105,000 and $25,500,000, respectively, for a combined total of $67,605,000. As of December 31, 2010, the total Delaware loan balance reported on Barnes' tax return was $127,202,495. It is unclear whether Barnes made any interest payments on the Delaware loans.

---

[34]Petitioners contend that the December 26, 2001, date on the first Delaware loan agreement was a typographical error and the date should have been December 26, 2000.

[*27] X. <u>PwC Opinion Letter</u>

Before the execution of the reinvestment plan in September 2000, PwC provided Barnes with a draft of an opinion letter that analyzed the Federal income tax consequences of the reinvestment plan. Mr. DeForte carefully reviewed the factual and legal analysis sections, created a markup of the draft opinion, and provided suggested factual revisions. Moreover, he had several discussions with PwC regarding the legal analysis and conclusions in the opinion. PwC provided Barnes with the final opinion letter on December 7, 2000.[35]

The focal point of the opinion letter was the two transfers between Bermuda and Delaware (BD exchanges), discussed <u>supra</u>, occurring on December 22, 2000, and July 9, 2001, whereby Bermuda received shares of Delaware preferred stock in exchange for foreign currency and shares of Bermuda common stock.[36] The

---

[35]The final opinion letter was 27 pages and did not materially differ from the draft opinion letter.

[36]Specifically, the BD exchanges refer to the following 2000 and 2001 transactions between Delaware and Bermuda: December 22, 2000--Bermuda transferred approximately 68,104,884 Singapore dollars (equivalent to $39,222,000) and 2,950,000 shares of Bermuda common stock to Delaware in exchange for Delaware's issuance of 42,172 shares of Delaware preferred stock to Bermuda; and July 9, 2001--Bermuda transferred approximately 2,916,342,315 Japanese yen (equivalent to $23,444,009) and 1,750,000 shares of its common stock to Delaware in exchange for Delaware's issuance of 25,127 shares of Delaware preferred stock to Bermuda.

[*28] opinion letter analyzed whether the BD exchanges resulted in an income inclusion under sections 951 and 956. The opinion letter concluded--

> The * * * [Delaware] preferred stock that will be held by * * * [Bermuda] should constitute an investment in U.S. property within the meaning of section 956(c)(1). However, * * * [Bermuda] should have a zero basis in the * * * [Delaware] preferred stock for U.S. federal income tax purposes. Since the income required to be included under section 956 is limited to the adjusted basis that * * * [Bermuda] has in the * * * [Delaware] preferred stock, no amount should be included in Barnes' income as a result of * * * [Bermuda's] investment in the * * * [Delaware] preferred stock.

Furthermore, the opinion letter addressed, to varying degrees, the implications of sections 269 and 301 and the step transaction doctrine. After a three-page analysis, the opinion letter concluded that section 269 should not apply to the reinvestment plan. The opinion letter also stated that the transaction should not result in a deemed repatriation of the funds under section 301. Moreover, the opinion letter briefly discussed Esmark, Inc. v. Commissioner, 90 T.C. 171 (1988), aff'd without published opinion, 886 F.2d 1318 (7th Cir. 1989), and concluded that "no other form of investment is more direct than the proposed investment by * * * [Bermuda] in the * * * [Delaware] shares." Indeed, the opinion letter opined that PwC's cconclusions should not be altered by "step transaction principles" because "there is no plan to alter the interests and relationships among the parties."

**[\*29]**  Finally, PwC found "substantial authority" for its findings in the opinion letter, stating--

> Provided that the information and assumptions contained herein are correct, substantial authority, within the meaning of section 6662 of the Code and Treas. Reg. Section 1.6662-(4)(d), exists to reach the conclusions made in this opinion, and we conclude that "there is a greater than 50-percent likelihood that the tax treatment" of the issues on which we have opined in this opinion will be upheld if challenged by the IRS.

XI.  Other Matters

A.  Subsequent Acquisitions

Following the completion of the reinvestment plan, Barnes continued searching for opportunities to expand each of its three business segments.  From 2002 through 2006 Barnes made several acquisitions both in the United States and abroad.

B.  Expert Testimony

Barnes hired two experts, Leigh Ann Riddick and Gordon Bodnar, to produce expert reports on the pretax profitability of the reinvestment plan and the characterization of the transfers between Barnes and its subsidiaries, respectively. Dr. Riddick's report concluded that without regard to any Federal tax considerations, the reinvestment plan would have been expected to generate a net economic benefit to Barnes of $1,294,229 to $2,054,706 during calendar year

[*30] 2001 and $5,559,772 to $7,984,559 during calendar years 2001 through 2003. Dr. Bodnar's report concluded that from a finance perspective: (1) the preferred stock issued by Delaware was an equity instrument and not a debt instrument; and (2) the reinvestment plan did not reflect a loan from ASA to Barnes or any of its subsidiaries.

## XII. Clean Room Issue--IBM Agreement

Around July 18, 1985, Barnes entered into "Agreement No. F155W" with IBM (1985 agreement) effective January 2, 1985. Pursuant to the 1985 agreement, Barnes constructed six clean rooms in a warehouse at one of its facilities in Windsor, Connecticut. The clean rooms were designed and constructed in accordance with IBM's specifications and could be used exclusively for IBM's work. The six clean rooms were each approximately 100 feet x 30 feet and included flooring, light, wall, exhaust, ventilation, and associated equipment. IBM paid Barnes for the construction costs of the rooms and retained ownership of the rooms, as well as the equipment and other property housed within them.

Under the 1985 agreement, Barnes would use the clean rooms to produce green sheets for IBM throughout 1985 and 1986 (although Barnes continued to use the rooms to produce green sheets for IBM in later years). In return Barnes would "recover its direct and indirect costs, including General and Administrative

[*31] * * * at 6.718% for 1985, plus a fee at ten percent (10%)." The 1985 agreement further stated that "The projected operating costs/expenses for 1985 are $1,273,021." For future years, the parties agreed that they would "make all attempts to convert from a cost plus fixed fee to a firm price contract" with "Future G&A percentages * * * subject to negotiation." Nowhere does the 1985 agreement specify that the agreement is a lease of Barnes' warehouse space, and no portion of payments is specifically designated to use of the warehouse space.

On or about March 31, 2001, Barnes and IBM entered into the First Amended and Restated Service Agreement No. MD003 (2001 agreement) effective January 1, 2001.[37] Pursuant to the 2001 agreement, IBM quitclaimed ownership of the six clean rooms and other property to Barnes.

XIII. Barnes' Tax Returns and Notice of Deficiency

Barnes timely filed consolidated Forms 1120, U.S. Corporation Income Tax Return, for all years at issue, reporting: (1) taxable income of $39,705,238 for 1998; (2) a taxable loss of $503,654 for 2000; and (3) a taxable loss of

---

[37]The 2001 agreement amends and restates Service Agreement No. MD002, dated January 31, 1998. Barnes has not been able to find Service Agreement No. MD002.

[*32] $10,754,459 for 2001.[38] Mr. DeForte reviewed and signed Barnes' income tax returns for all years at issue.

A. Reinvestment Plan

Barnes included the following documents related to the reinvestment plan with its 2000 and 2001 Federal income tax returns: (1) Forms 926, Return by a U.S. Transferor of Property to a Foreign Corporation, reporting the aforementioned series of purported section 351 transactions among Barnes, Delaware, Bermuda, and ASA; and (2) certain statements required by section 1.351-3(a), (b), and (c), Income Tax Regs., further reporting details of the purported section 351 transactions. Barnes did not report any income attributable to the reinvestment plan but later amended its 1998 Federal income tax return to claim a net operating loss carryback of $503,654 from its 2000 tax year.

B. IBM Agreement

On its Federal income tax return for the tax year ending December 31, 2001, Barnes reported $3,315,850 of income attributable to the receipt of the six clean rooms and other property: (1) $1,700,000 was attributable to the four 10,000 PPM clean rooms; (2) $850,000 was attributable to the two 100,000 PPM clean rooms;

---

[38]While Barnes did not report any tax due for 2001, Barnes reported $1,026,372 of tax due on its 2000 income tax return as a result of the alternative minimum tax.

[*33] and (3) the balance was attributable to other property. Barnes also claimed a $32,566 depreciation expense with respect to the clean rooms on its 2001 income tax return.

### C. Notice of Deficiency

In the notice of deficiency dated August 20, 2009, respondent: (1) increased Barnes' 2000 taxable income by $38,919,950, which represented ASA's $39 million aggregate transfer (minus a minor conversion rate adjustment) that eventually was transferred to Barnes; and (2) increased Barnes' 2001 taxable income by $19,378,596, which represented ASA's $23,311,897 transfer (minus a conversion rate adjustment and an earnings and profits adjustment) that eventually was transferred to Barnes; (3) determined that the value of the four 10,000 PPM clean rooms was $2,520,000 and that as a result Barnes should have recognized additional income of $820,000 for the 2001 tax year; and (4) disallowed Barnes' 1998 net operating loss carryback of $503,654 from its 2000 tax year.

OPINION

## I. Burden of Proof

The taxpayer bears the burden of proving by a preponderance of the evidence that the Commissioner's determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In general, the burden of proof

[*34] with regard to factual matters rests with the taxpayer. Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to the factual issue. Petitioners have not alleged that section 7491(a) applies or established their compliance with its requirements. Therefore, the burden of proof remains on petitioners. See Rule 142(a).

II. Revenue Ruling 74-503

As a preliminary matter, petitioners contend that respondent is precluded from challenging the reinvestment plan because: (1) petitioners reasonably relied on Rev. Rul. 74-503, 1974-2 C.B. 117; and (2) Rev. Rul. 2006-2, 2006-1 C.B. 261, states that "Under the authority of section 7805(b), the Service will not challenge a position taken prior to December 20, 2005, with respect to a transaction occurring prior to such date, by a taxpayer that reasonably relied on the conclusions in Rev. Rul. 74-503."

Rev. Rul. 74-503, supra, provides guidance where treasury stock is exchanged for newly issued stock of another corporation. Specifically, the ruling addresses a situation where treasury stock is purchased by a corporation (corporation X) from its shareholders for less than fair market value and

[*35] subsequently exchanged for 80% of the newly issued stock of another corporation (corporation Y), in a transaction in which no gain or loss was recognized by either corporation under sections 351(a) and 1032(a).

The revenue ruling first concludes that section 358(a) should not determine the basis of the stock received by each corporation--

> Section 358(a) * * * provides * * * rules for determining the basis of property received by a transferor in a transaction to which section 351 applies.  However, section 358(e) provides that section 358(a) does not apply to property acquired by a corporation by the exchange of its stock as consideration in whole or in part for the transfer of property to it.  Therefore, section 358(a) is not applicable in determining the basis of the [corporation] Y stock received by [corporation] X in the transaction.  [Rev. Rul. 74-503, 1974-2 C.B. at 117.]

The analysis continues by recognizing that section 1.1032-1(d), Income Tax Regs., provides that the basis of property acquired by a corporation in connection with a section 351 transaction should be determined under section 362.  Section 362(a) provides that the basis to a corporation of property acquired in a section 351 transaction will be the same as it would be in the hands of the transferor, increased by the amount of gain recognized to the transferor on the transfer.  After determining that unissued stock and treasury stock both have a zero basis, the revenue ruling concludes that, according to section 362(a), the basis of the stock received by each corporation in the exchange is zero.

**[*36]**  A.  <u>Arguments of the Parties</u>

Petitioners focus their preclusion argument on the BD exchanges, discussed <u>supra</u>, concluding that there are no material factual differences between the BD exchanges and Rev. Rul. 74-503, <u>supra</u>.  Conversely, respondent argues that the reinvestment plan must be examined in its entirety, rather than focusing only on the BD exchanges.  Applying substance over form principles to the entirety of the reinvestment plan, respondent argues that, in substance, the reinvestment plan should be characterized as either a dividend or a loan from ASA to Barnes.  Respondent concludes that Rev. Rul. 74-503, <u>supra</u>, does not cover the facts of the reinvestment plan.

B.  <u>Analysis</u>

Section 601.601(d)(2)(v)(a), Statement of Procedural Rules, provides that "[t]he conclusions expressed in Revenue Rulings will be directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling."  Furthermore, section 601.601(d)(2)(v)(e), Statement of Procedural Rules, provides--

> Taxpayers generally may rely upon Revenue Rulings published in the Bulletin in determining the tax treatment of their own transactions and need not request specific rulings applying the principles of a published Revenue Ruling to the facts of their particular cases.  However, since each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are

**[\*37]** cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same.  They should consider the effect of subsequent legislation, regulations, court decisions, and revenue rulings.

In <u>Briarcliff Candy Corp. v. Commissioner</u>, T.C. Memo. 1987-487, we noted that "Revenue Rulings of respondent speak to the limited fact situations before respondent at that moment."  Moreover, in <u>Anschutz Co. v. Commissioner</u>, 664 F.3d 313, 330 10th Cir. (2011), <u>aff'g</u> 135 T.C. 78 (2010), the Court of Appeals for the Tenth Circuit observed that the problem with the taxpayer's reliance on a revenue ruling was that the transactions at issue in the case before the court, considered as a whole, were different from the entirety of the transactions at issue in the revenue ruling.

Before comparing the facts considered in the revenue ruling with those of the reinvestment plan, we note that petitioners' preclusion argument can succeed only if we respect the form of the reinvestment plan.  See <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 573 (1978) ("The Court has never regarded 'the simple expedient of drawing up papers', * * * as controlling for tax purposes when the objective economic realities are to the contrary." (quoting <u>Commissioner v. Tower</u>, 327 U.S. 280, 291 (1946))).  Accordingly, petitioners must clear two hurdles in order to show that they reasonably relied on the conclusions in Rev.

**[\*38]** Rul. 74-503, <u>supra</u>, so that respondent is precluded from challenging the reinvestment plan: (1) that we should respect the form of the reinvestment plan; and (2) that the facts of the reinvestment plan are substantially the same as those considered in the revenue ruling. Petitioners' preclusion argument fails to clear either hurdle.

First, as discussed <u>infra</u>, Rev. Rul. 74-503, <u>supra</u>, does not preclude respondent's challenge because we believe that the substance of the reinvestment plan was a dividend from ASA to Barnes. Furthermore, even if we were to respect the form of the reinvestment plan, Rev. Rul. 74-503, <u>supra</u>, still would not preclude respondent's challenge because there are substantial factual differences between Rev. Rul. 74-503, <u>supra</u>, and the reinvestment plan.

Petitioners were cautioned against reaching the same conclusions as Rev. Rul. 74-503, <u>supra</u>, unless the reinvestment plan involved substantially the same facts and circumstances as the revenue ruling, and petitioners were advised to consider subsequent legislation, regulations, court decisions, and revenue rulings. <u>See</u> sec. 601.601(d)(2)(v)(e), Statement of Procedural Rules. The reasoning is straightforward--additional facts beget additional issues.

We believe petitioners' argument distorts the scope of the "will not challenge" language in Rev. Rul. 2006-2, <u>supra</u>. Respondent is not challenging

**[*39]** petitioners' zero-basis conclusions as a result of the BD exchanges per se but is challenging the reinvestment plan as a whole. In order for Rev. Ruls. 74-503 and 2006-2, supra, to preclude respondent's challenge, the facts and circumstances surrounding the reinvestment plan would have to be limited to the facts discussed in Rev. Rul. 74-503, supra. The pivotal facts addressed in that revenue ruling involved a corporation simply exchanging treasury stock for the previously unissued stock of another corporation in a section 351 transaction.

The pivotal facts associated with the reinvestment plan far exceed the circumstances addressed in Rev. Rul. 74-503, supra. The BD exchanges, considered alone, do have factual similarities to the revenue ruling--primarily, both involved stock-for-stock exchanges. However, there are also substantial differences between the two: (1) the BD exchanges were between two wholly owned subsidiaries that were formed to participate in a larger plan; (2) one of the subsidiaries was a controlled foreign corporation; and (3) the exchanges involved transferring approximately $62 million from a foreign country to the United States.

Notwithstanding the preceding analysis, the BD exchanges should not be compared to Rev. Rul. 74-503, supra, in isolation because the BD exchanges were part of a series of steps in an integrated transaction mandated by contractual

[*40] agreement.  Accordingly, we should compare the entirety of the reinvestment plan to the situation in the revenue ruling in deciding whether respondent is precluded from challenging petitioners' plan.  In doing so, we summarize the vast factual disparities between the two:  (1) the reinvestment plan involved, both explicitly and indirectly, seven entities, six of which are subsidiaries of a common parent, Barnes; (2) the plan involved multiple section 351 transactions and multiple loans (one of which was from a third party); (3) Bermuda and Delaware were formed for the purpose of participating in the plan; (4)  ASA and Bermuda were controlled foreign corporations; (5) ASA had substantial earnings and profits; (6) Barnes, ASA, Bermuda, and Delaware contracted to undertake a series of transactions that resulted in a substantial amount of money from three entities with earnings and profits being transferred back into the United States without any tax consequences; and (7) the resulting structure of the plan, discussed infra, was not respected--particularly, Bermuda's preferred stock investment in Delaware and Delaware's loan to Barnes.

Because the reinvestment plan far exceeded the scope of the stock-for-stock exchange addressed in Rev. Rul. 74-503, supra, respondent is not precluded from challenging the reinvestment plan.

**[*41]** III.  <u>Worldwide Taxation</u>

One of the primary reasons Barnes wanted ASA's excess cash was so that Barnes could put the money to a more productive use--specifically, to use ASA's excess cash that was earning a low rate of return to pay off Barnes' high-interest debt.  Before discussing whether the substance of the reinvestment plan aligns with its form, it is important to understand why ASA did not directly pay a dividend to Barnes, make a loan to Barnes, or make an equity investment in Barnes.

U.S. corporations are ordinarily taxed under section 11 on their worldwide income; however, subject to many exceptions, the income of a foreign subsidiary of a U.S. corporation generally is not subject to U.S. tax if the income was earned outside the United States and not repatriated as a dividend.  <u>See</u> Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders, para. 15.20 [1][a], at 15-85, 15-86 (7th ed. 2002).  Some domestic corporations, therefore, choose to keep a foreign subsidiary's earnings abroad in order to defer U.S. tax until the money is repatriated.  <u>See</u> Office of Tax Policy, U.S. Dept. of Treasury, Doc. 2001-492, The Deferral of Income Earned through U.S. Controlled Foreign Corporations: A Policy Study 13 (2000).

**[*42]** A.  Dividend Payment

A distribution of property by a corporation to a shareholder with respect to his stock shall be included in the gross income of the shareholder as a dividend to the extent of the corporation's earnings and profits.  See secs. 301(a), (c), 316(a). ASA had earnings and profits in 2000 and 2001 in excess of the amounts ASA transferred to Barnes through the reinvestment plan.  Accordingly, if the reinvestment plan is disregarded and ASA is deemed to have made a distribution directly to Barnes, Barnes should have reported dividend income on its 2000 and 2001 Federal income tax returns equal to the respective amount of money received from ASA's earnings and profits each year.

B.  Debt or Equity Investment

A loan or equity investment from ASA to Barnes would also result in Barnes' recognizing taxable income.  Congress, through subpart F (sections 951 through 965), sought to limit tax deferrals by any foreign corporation that meets the definition of a "controlled foreign corporation" (CFC) as defined under section

**[\*43]** 957(a).[39]  Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 272 (2002).  The parties agree that ASA and Bermuda were CFCs in 2000 and 2001.

The relevant subpart F provisions in this case are sections 951 and 956. Under section 951, subject to various restrictions and qualifications, U.S. shareholders of a CFC are taxed directly on their pro rata share of the CFC's earnings that are invested in certain types of U.S. property (section 951 inclusion). Secs. 951(a)(1)(B), 956(a).[40]  U.S. property includes, inter alia, stock and debt of U.S. corporations.  See sec. 956(c)(1)(B) and (C).  The amount of the investment is the CFC's adjusted basis in the U.S. property.  See sec. 956(a).

In the case before us, Barnes is the U.S. shareholder of Bermuda and ASA, both CFCs.  Barnes, therefore, would recognize a section 951 income inclusion to

---

[39]Generally, a controlled foreign corporation is any foreign corporation where more than 50% of (1) the total combined voting power of all classes of stock of the corporation entitled to vote, or (2) the total value of the stock of the corporation, is owned by U.S. shareholders on any day during the taxable year of the foreign corporation.  See sec. 957(a).

[40]More specifically, the sec. 951 inclusion is the U.S. shareholder's pro rata share of the lesser of two amounts:  (1) the excess of (a) the average amounts of the CFC's investments in U.S. property as of the end of each quarter of the taxable year over (b) the CFC's earnings and profits representing previous sec. 951 inclusions; or (2) the amount of the CFC's "applicable earnings", as defined in sec. 956(b)(1), representing essentially the CFC's current and accumulated earnings and profits that have not already been included in its U.S. shareholders' gross incomes.  Rodriguez v. Commissioner, 137 T.C. 174, 176, n.3 (2011).

[*44] the extent of the adjusted basis of U.S. property held by Bermuda or ASA as a result of the reinvestment plan (to the extent that Bermuda or ASA had earnings and profits).

Petitioners assert that in substance and form Bermuda made investments in Delaware's preferred stock in section 351 transactions. Relying on Rev. Rul. 74-503 and sections 358, 362, and 1032, discussed supra, petitioners argue that Bermuda has a zero basis in Delaware's preferred stock. Therefore, petitioners conclude Barnes' section 951 income inclusion is zero. Moreover, petitioners assert that the substance over form doctrines only apply when the substance and form of a transaction are not aligned. Because the substance of the reinvestment plan does not reflect a loan or dividend from ASA, petitioners argue that respondent's attempt to recharacterize the reinvestment plan fails as a matter of law.

Respondent does not believe the substance of the reinvestment plan aligns with its form. As mentioned supra, respondent argues that in substance the reinvestment plan should be characterized as either a dividend from ASA to Barnes under section 301 or as a loan from ASA to Barnes under sections 951(a)(1)(B) and 956. Respondent's arguments rely on the substance over form

**[*45]** principles embodied in the conduit theory, the step transaction doctrine, and section 269.[41]

IV. Expert Reports

Petitioners submitted two expert reports to demonstrate that the reinvestment plan would produce a net economic benefit and that the form of the plan should be respected. We assume that it is economically beneficial in many instances for multinational corporations to invest overseas profits in the United States. The reason many corporations decide otherwise is simple--taxes. The correct inquiry therefore is not whether there was an economic purpose for transferring ASA's excess cash to the United States. We can assume Barnes had one. The correct

---

[41] Sec. 269 provides the Secretary with the authority to disallow deductions, credits, or other allowances secured by a taxpayer in an acquisition when the principal purpose of the acquisition was the evasion or avoidance of Federal income tax. Furthermore, under the conduit theory of the substance over form doctrine, the court may disregard an entity if it is a mere conduit for the real transaction at issue. Enbridge Energy Co., Inc. v. United States, 553 F. Supp. 2d 716, 726 (S.D. Tex. 2008) (citing Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945)).

Because we find that the reinvestment plan in substance was a dividend from ASA to Barnes under the step transaction doctrine, we do not address the following any further: (1) respondent's loan theory under secs. 951(a)(1)(B) and 956; (2) respondent's sec. 269 argument; and (3) respondent's conduit theory argument.

[*46] inquiry is whether the reinvestment plan is subject to taxation in the Untied States. Accordingly, we need not discuss this expert report any further.

The second expert report also does not merit much consideration. This report finds that the form of the reinvestment plan should be respected; however, the report overlooks one serious consideration--petitioners have not shown that they respected the form of the plan. Accordingly, the findings of this report are of minimal probative value.

V. Substance Over Form

It is axiomatic that the substance of a transaction governs for tax purposes. See Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction."); Gregory v. Helvering, 293 U.S. 465 (1935); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 288 (1990) ("[T]he substance of the transaction is controlling, not the form in which it is cast or described."). The judicial doctrines favoring substance over form are used as a tool for effecting the underlying congressional purpose of a statute. Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1354 (Fed. Cir. 2006). Consequently, despite literal compliance with a statute, tax benefits will not be afforded on the basis of transactions lacking in substance. Id.; see also Gregory v. Helvering, 293 U.S. at 469.

**[\*47]** While petitioners' conclusions about the tax implications of the reinvestment

plan may have been based on their interpretation of Rev. Rul. 74-503, supra, and

sections 358, 362, and 1032, if the reinvestment plan lacked economic substance the

form of the plan will not be respected for Federal income tax purposes.  See

Commissioner v. Court Holding Co., 324 U.S. at 334  ("To permit the true nature of

a transaction to be disguised by mere formalisms, which exist solely to alter tax

liabilities, would seriously impair the effective administration of the tax policies of

Congress.").

> A.  Step Transaction Doctrine, in General

> The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C.  The whole purpose of the unnecessary stops is to achieve tax consequences differing from those which a direct path from A to D would have produced.  In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening stops may be disregarded or rearranged. * * * [Smith v. Commissioner, 78 T.C. 350, 389 (1982), aff'd without published opinion, 820 F.2d 1220 (4th Cir. 1987).]

Under the step transaction doctrine, a particular step in a transaction is

disregarded for tax purposes if the taxpayer could have achieved its objective more

directly but instead included the step for no other purpose than to avoid tax

liability.  Long-Term Capital Holdings v. United States, 150 Fed. Appx. 40, 43 (2d

Cir. 2005) (citing Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210, 213

**[\*48]** (D.C. Cir. 2001)).  On the other hand, the Commissioner may not "generate events which never took place just so an additional tax liability might be asserted." Grove v. Commissioner, 490 F.2d 241, 247 (2d Cir. 1973), aff'g T.C. Memo. 1972-98.

Courts generally apply one of three alternative tests in deciding whether to invoke the step-transaction doctrine and disregard a transaction's intervening steps: (1) the binding commitment test; (2) the end result test; and (3) the interdependence test.  Superior Trading, LLC v. Commissioner, 137 T.C. 70, 88 (2011).  We note that these tests are not mutually exclusive and that a transaction need satisfy only one of the tests to allow for the step transaction doctrine to be invoked.  Id. at 90 (citing Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1527-1528 (10th Cir. 1991)).

B. Three Tests

1. Binding Commitment Test

The binding commitment test considers whether at the time of taking the first step there was a binding commitment to undertake the subsequent steps.  See Commissioner v. Gordon, 391 U.S. 83, 96 (1968) (holding that "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps").  However, the binding commitment test "'is seldom used and is

**[\*49]** applicable only where a substantial period of time has passed between the steps that are subject to scrutiny'." Superior Trading, LLC v. Commissioner, 137 T.C. at 89 (quoting Andantech v. Commissioner, T.C. Memo. 2002-97, aff'd in part, remanded in part, 331 F.3d 972 (D.C. Cir. 2003)). The reinvestment plan was executed in two parts spanning less than a year--each part took place over a matter of days. We do not think the binding commitment test is appropriate in this case. See Associated Wholesale Grocers, Inc., 927 F.2d at 1522 (declining to apply the binding commitment test because the case did not involve a series of transactions spanning several years).

2. End Result Test

"Under the end result test, the step transaction doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." Greene v. United States, 13 F.3d 577, 583 (2d Cir. 1994). The end result test focuses on the parties' subjective intent at the time of structuring the transaction. See True v. United States, 190 F.3d 1165, 1175 (10th Cir. 1999) (holding that what matters is not whether the parties intended to avoid taxes but whether they intended "to reach a particular result by structuring a series of transactions in a certain way"). The test examines whether the formally separate steps are prearranged components of a

**[\*50]** composite transaction intended from the outset to arrive at a specific end result.  Superior Trading, LLC v. Commissioner, 137 T.C. at 89.

        3.  Interdependence Test

The interdependence test analyzes whether the intervening steps are so interdependent that the legal relations created by one step would have been fruitless without completion of the later steps.  Greene, 13 F.3d at 584 (citing Am. Bantam Car Co. v. Commissioner, 11 T.C. 397, 405 (1948), aff'g, 177 F.2d 513 (3d Cir. 1949)).  If, however, intermediate steps accomplished valid and independent economic or business purposes, courts respect their independent significance.  See id.; Superior Trading, LLC v. Commissioner, 137 T.C. at 90.  Likewise, a taxpayer may proffer some nontax business purpose for engaging in a series of transactional steps to accomplish a result he could have achieved by more direct means, but that business purpose alone does not preclude the application of the step transaction doctrine.  True, 190 F.3d at 1177 (citing Associated Wholesale Grocers, Inc., 927 F.2d at 1527); Long-Term Capital Holdings, 150 Fed. Appx. at 43.

Cognizant of our power to invoke the step transaction doctrine when any of the three tests is satisfied, we believe the interdependence test is the most appropriate for this case.  In applying the interdependence test in this case, we

[*51] focus on whether any valid and independent economic or business purpose was served by the inclusion of Bermuda and Delaware in the reinvestment plan.

We begin by noting that during 2000 and 2001 Barnes directly or indirectly owned 100% of the stock of ASA, Delaware, and Bermuda.  As a result, the reinvestment plan was executed between related parties and therefore deserves extra scrutiny.  See Merck & Co. v. United States, 652 F.3d 475, 481 (3d Cir. 2011); Kraft Food Co. v. Commissioner, 232 F.2d 118, 123 (2d Cir. 1956), rev'g 21 T.C. 513 (1954); Maxwell v. Commissioner, 95 T.C. 107, 116 (1990).

Petitioners make the following representations:  (1) Bermuda was incorporated and included in the reinvestment plan at the suggestion of PwC because "Singapore corporate law did not permit ASA to make the type of equity investment required by the transaction"; and (2) Delaware was "necessary to provide Barnes with a State tax benefit unrelated to Federal income taxes and also to facilitate the more effective control over the funds invested by ASA."  Furthermore, petitioners argue that both entities were necessary to accomplish Barnes' overall goal of "more efficiently using ASA's excess cash and borrowing capacity to temporarily pay down third party indebtedness while preserving all of ASA's excess cash and borrowing capacity for use in forthcoming acquisitions outside of the United States."

**[\*52]**             a.  <u>Bermuda's Business Purpose</u>

Petitioners rely on Mr. Coneys' testimony that Singapore law restricted a subsidiary from investing in its parent, to explain Bermuda's nontax reason for participating in the reinvestment plan.  Petitioners go so far as to argue on brief that "but for the Singapore law restrictions, Bermuda would not have been formed and would not have participated in the transaction."

In determining foreign law, we are free to consider "any relevant material or source, including testimony, whether or not submitted by a party or otherwise admissible.  The Court's determination shall be treated as a ruling on a question of law."  Rule 146; <u>see also</u> <u>Angerhofer v. Commissioner</u>, 87 T.C. 814, 819 (1986). The only specific reference to Singapore law restrictions was in the PwC memo mentioning section 21 of the Singapore Companies Act.  Oddly, petitioners do not cite section 21 of the Singapore Companies Act in their brief, nor do they explain the reason this restriction required involving Bermuda in the reinvestment plan.  We will not attempt to do petitioners' research or make their argument for them.  <u>See</u> <u>Muhich v. Commissioner</u>, 238 F.3d 860, 864 n.10 (7th Cir. 2001) (issues not addressed or developed are deemed waived; it is not the court's obligation to research and construct the parties' arguments), <u>aff'g</u> T.C. Memo. 1999-192; <u>330 W. Hubbard Rest. Corp. v. United States</u>, 203 F.3d 990, 997 (7th Cir. 2000) (same);

**[\*53]** <u>Larson v. Northrop Corp.</u>, 21 F.3d 1164, 1168 n.7 (D.C. Cir. 1994) (declining to reach issues neither argued nor briefed). Furthermore, the PwC memo also states "Singapore <u>does not limit</u> a corporate entity's ability to invest internationally." (Emphasis added.) If that is true, contradictory to petitioners' position ASA could have invested its funds directly in Delaware.

### b. Delaware's Business Purpose

Similarly, petitioners provide minimal support for Delaware's business purpose other than testimony from Mr. Coneys and Dr. Riddick. Dr. Riddick testified that it would be "highly unusual for * * * a large company with international operations not to create a financial subsidiary for * * * [the reinvestment plan] because doing so provides transparency * * * of what happened for everyone involved in the company * * * [as well as] the shareholders". Mr. Coneys testified that Delaware: (1) "created a state tax benefit"; (2) was a necessary part to accomplish the overall plan; and (3) provided centralized management and currency controls.

Petitioners have not explained what "state tax benefit" they are referring to, and as noted <u>supra</u>, we will not attempt to do their research or make their argument for them. Furthermore, while we recognize that many large corporations create financing subsidiaries for various legitimate nontax business reasons, petitioners'

**[*54]** inability to show that the form of the plan was respected, discussed infra, renders any further consideration of petitioners' "cash management" argument moot.

### c. Substance of the Reinvestment Plan

As indicated, petitioners' inability to show that the form of the reinvestment plan was respected further undermines any legitimate nontax business purpose for including Bermuda and Delaware in the plan. First, the Delaware loans were not bonafide loans. While Barnes and Delaware complied with the initial formalities of a bonafide loan, mainly signing written loan agreements and recording the transactions on their respective financial statements, they failed to show that they complied with the terms of the written agreements. The Delaware loans required Barnes to make annual interest payments; however, as of December 31, 2010, the loan balance had ballooned to over $127 million. Petitioners assert that Barnes made over $8 million in interest payments during that period. They support their argument by comparing (a) the Delaware loan balance reported on Barnes' 2010 tax return with (b) what petitioners compute the 2010 loan balance would have been if no interest payments had been made. The difference, petitioners attest, represents interest payments. Nonetheless, petitioners do not identify any interest payments recorded in Barnes' or Delaware's general ledgers or bank statements.

[*55] Not only is petitioners' supporting evidence far from sufficient; even if Barnes had made over $8 million in interest payments as of December 31, 2010, this amount is far short of the aggregate 7.5% annual interest payments required over that period.[42]

It is less clear whether Delaware made any preferred dividend payments to Bermuda. Petitioners rely on Forms 1042 and 1120-F to show that Delaware made the preferred dividend payments to Bermuda; however, petitioners' tax returns, considered alone, are insufficient evidence to substantiate their position. See Lawinger v. Commissioner, 103 T.C. 428, 438 (1994) ("Tax returns do not establish the truth of the facts stated therein."); Halle v. Commissioner, 7 T.C. 245 (1946), aff'd, 175 F.2d 500 (2d Cir. 1949); Taylor v. Commissioner, T.C. Memo. 2009-235. Moreover, petitioners failed to identify any of these transactions in Delaware's or Bermuda's general ledgers or bank statements, nor did they produce a Delaware board resolution declaring a preferred dividend. Finally, because, as we concluded, Barnes failed to show it made any interest payments to Delaware, Delaware was financially incapable of making the purported preferred dividend payments to Bermuda.

---

[42]For example, after the completion of the reinvestment plan in 2001, Delaware had purportedly lent Barnes $67,605,000. After two full years Barnes would have been required to make over $10 million in interest payments.

**[*56]**          d. <u>Conclusion</u>

In the light of the fact that petitioners bear the burden of proof and that the reinvestment plan deserves extra scrutiny, petitioners' vague assertions regarding Singapore law impediments, State tax benefits, and cash management are insufficient to support a finding that Bermuda and Delaware were created for legitimate nontax business purposes. Furthermore, petitioners have not shown that they respected the form of the reinvestment plan. Accordingly, we conclude that Bermuda and Delaware did not have a valid business purpose and that the various intermediate steps of the reinvestment plan are properly collapsed into a single transaction under the interdependence test.

While petitioners assert that the reinvestment plan was always intended to be a temporary structure, the objective facts suggest otherwise. ASA transferred a substantial amount of cash to Barnes (funneled through Bermuda and Delaware) which Barnes used to pay off its debt. Barnes has not shown that it returned any of ASA's funds. We find that the reinvestment plan was in substance dividend payments from ASA to Barnes in 2000 and 2001, taxable under section 301.

VI. <u>IBM Agreement and Section 109</u>

In the petition petitioners argued that Barnes incorrectly included the value of the clean rooms in 2001 income after those clean rooms were quitclaimed by

[*57] IBM to Barnes during that year. Rather, petitioners claim that the value of the clean rooms is excluded from income under section 109.

Section 109 provides that "[g]ross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee." Petitioners claim that the 1985 agreement operated in substance as a lease of Barnes' warehouse by IBM, during which IBM had the clean rooms constructed in the warehouse (by Barnes). Petitioners argue that this lease ended when IBM quitclaimed the clean rooms to Barnes in 2001, and section 109 thus applies to Barnes' receipt of the clean rooms. Respondent asserts that the 1985 agreement is purely a services agreement and that section 109 is inapplicable. We agree with respondent that section 109 does not apply in this case.

The Court of Appeals for the Second Circuit has stated that "A 'lease' is a contract conveying a temporary interest in real property, with reversion to the grantor." Resolution Trust Corp. v. Diamond, 45 F.3d 665, 673 (2d Cir. 1995). The court in Resolution Trust also stated--

> A lease is a species of contract--an "agreement which gives rise to [the] relationship of landlord and tenant." * * * The "tenant" is "one who has the temporary use and occupation of real property owned by

[*58] another person, (called the 'landlord,') the duration and terms of his tenancy being usually fixed by an instrument called a 'lease.'" [Id. at 672-673 (citations omitted) (quoting Black's Law Dictionary 1035, 1635 (4th ed. 1951)).]

Because this case is appealable to the Court of Appeals for the Second Circuit, we choose to follow that court's precedent. See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'g, 445 F.2d 985 (10th Cir. 1971).

After reviewing the 1985 agreement and other facts of the case, we find that the 1985 agreement did not operate as a lease of Barnes' warehouse by IBM. Crucial in our determination is the fact that Barnes not only constructed the clean rooms in its warehouse, but also maintained control of and used those clean rooms for approximately 16 years making green sheets for IBM. In return Barnes was paid by IBM for its services; these payments reimbursed Barnes for all direct and indirect costs as well as a 10% fee. Although IBM had legal ownership of the clean rooms, Barnes was the party using those clean rooms in its own warehouse for its own benefit. The fact that the clean rooms were stored in the warehouse may have provided some indirect benefits to IBM (such as protection from the elements), but the direct benefit was to Barnes, which was able to use the clean rooms to obtain a profit as a result of its deal with IBM. We thus believe that IBM

**[\*59]** was not using or occupying Barnes' warehouse and was therefore not a tenant to a lease.

We further note that Barnes and IBM did not label the 1985 agreement a lease, and petitioners have provided no evidence that the parties ever used that term with regard to the clean room arrangement. Considering the facts, we find that the 1985 agreement did not operate as a lease of Barnes' warehouse to IBM and that section 109 is inapplicable.

VII. Section 6662(a) Accuracy-Related Penalty

Respondent determined that petitioners are liable for 20% accuracy-related penalties under section 6662(a) and (b)(1) for negligence or disregard of rules and regulations, or in the alternative, under section 6662(a) and (b)(2) for substantial understatements of income tax. Respondent determined that these penalties should apply for 1998,[43] 2000, and 2001. Petitioners contest the imposition of accuracy-related penalties on grounds that they had substantial authority for their

---

[43]The penalty for a substantial understatement of income tax applies to any portion of an underpayment in a carryback year that is attributable to a "tainted item" in the year the carryback loss arose (loss year). Sec. 1.6662-4(c)(1), Income Tax Regs. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Id. "Tainted items" are taken into account with items arising in a carryback year to determine whether the understatement is substantial for that year. Id. A "tainted item" is any item for which there is neither substantial authority nor adequate disclosure with respect to the loss year. Sec. 1.6662-4(c)(3)(I), Income Tax Regs.

**[*60]** position and that they reasonably and in good faith relied on the PwC opinion letter.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. Considering the facts of the case, we find respondent has met his burden of production with respect to the accuracy-related penalties.

Section 6662(a) and (b)(1) and (2) imposes a 20% penalty on the portion of an underpayment of tax (1) attributable to a substantial understatement of income tax or (2) due to negligence or disregard of rules or regulations.[44] Section 6662(c) defines "negligence" as any failure to make a reasonable attempt to comply with

---

[44]Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set forth in sec. 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

[*61] the provisions of the Code, and "disregard" as any careless, reckless, or intentional disregard. A substantial understatement of income tax is defined as an understatement that exceeds the greater of 10% of the tax required to be shown on the tax return or $10,000. See sec. 6662(d)(1)(A). However, the understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position and has a reasonable basis for such position or (2) has substantial authority for the tax treatment of the item. See sec. 6662(d)(2)(B). Petitioners have not asserted that there was adequate disclosure of their position on the Forms 1120 for 2000 and 2001.

A. Substantial Authority

We previously concluded that the reinvestment plan was in substance dividends from ASA to Barnes, taxable under section 301. In the absence of substantial authority supporting their tax treatment of the reinvestment plan, petitioners would agree that the understatements of tax for all years in issue exceed the greater of 10% of the tax required to be shown on the returns or $10,000. However, petitioners argue that there was no understatement of tax for any year because they had substantial authority for the tax treatment of their plan. See sec. 6662(d)(2)(B).

[*62] The substantial authority standard is an objective standard less stringent than the more likely than not standard (the standard that is met when there is a greater than 50% likelihood of the position's being upheld). Sec. 1.6662-4(d)(2), Income Tax Regs. There is substantial authority for the tax treatment of an item only if the weight of all relevant authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Sec. 1.6662-4(d)(3)(I), Income Tax Regs. The weight accorded an authority depends on its relevance and persuasiveness and the type of document providing the authority. Sec. 1.6662-4(d)(3)(ii), Income Tax Regs. For example, a case or a revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts. Id.

Petitioners' assert that Rev. Rul. 74-503, supra, and sections 358, 362, 1032, and 956 provide substantial authority for their position.[45] We disagree. As discussed supra, the reinvestment plan involved a substantial amount of additional fact not considered in the revenue ruling--the two are materially distinguishable on their facts. Accordingly, petitioners' position is afforded little weight. Moreover, we have long recognized that a transaction lacking in substance will not be

---

[45]Petitioners also cite G.C.M. 34998 (Aug. 23, 1972) to support their position; however, general counsel memorandums over 10 years old are afforded very little weight. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.

**[\*63]** respected for Federal income tax purposes. <u>See, e.g.</u>, <u>Frank Lyon Co.</u>, 435 U.S. at 573; <u>Minn. Tea Co. v. Helvering</u>, 302 U.S. 609, 613-614 (1938); <u>Gregory v. Helvering</u>, 293 U.S. 465; <u>Horn v. Commissioner</u>, 968 F.2d 1229, 1236 (D.C. Cir. 1992), <u>rev'g</u> <u>Fox v. Commissioner</u>, T.C. Memo. 1988-570; <u>see also</u> <u>CMA Consol., Inc. & Subs. v. Commissioner</u>, T.C. Memo. 2005-16 ("Numerous courts have held that a transaction that is entered into primarily to reduce tax and which otherwise has minimal or no supporting economic or commercial objective, has no effect for Federal tax purposes.").

Considering the long history of the substance over form doctrine in combination with petitioners' inability to establish their business purpose for Bermuda or Delaware, we find that petitioners' reference to a factually dissimilar revenue ruling has insufficient weight to support a finding that petitioners had substantial authority for their tax treatment of the reinvestment plan.

B. <u>Reasonable Cause and Good Faith</u>

The section 6662(a) accuracy-related penalty does not apply to any portion of the underpayment as to which the taxpayers establish that they acted with reasonable cause and in good faith. <u>See</u> sec. 6664(c)(1); <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98 (2000), <u>aff'g</u>, 299 F.3d. 221 (3d Cir. 2002). The decision as to whether the taxpayer acted with reasonable cause and in good

[*64] faith depends upon all the pertinent facts and circumstances, including the taxpayer's efforts to assess his proper tax liability, the taxpayer's knowledge and experience, and the reliance on the advice of a professional. See sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to reasonably rely on the advice of a professional so as to possibly negate a section 6662 accuracy-related penalty, the taxpayer must prove by a preponderance of the evidence that he meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Respondent does not dispute PwC's expertise or whether petitioners provided all necessary and accurate information to PwC. Respondent's argument focuses on the third factor--that petitioners did not actually rely in good faith on PwC's advice. We agree with respondent.

The opinion letter provided to petitioners from PwC discusses tax implications of the reinvestment plan. However, as previously discussed, petitioners did not respect the structure of the reinvestment plan. In particular,

[*65] Bermuda's preferred stock investment in Delaware and Delaware's loan to Barnes were not respected as bona fide transactions.

The reinvestment plan involves a complex and technical area of law in which precision is required. However, petitioners did not act in accordance with the specific requirements of the plan as stated in the PwC opinion letter. Petitioners' employees (Mr. DeForte in particular) were highly knowledgeable people who knew what they were doing and who thoroughly reviewed the reinvestment plan and opinion letter. By failing to respect the details of the reinvestment plan set up by PwC, we find that petitioners have forfeited any defense of reliance on the opinion letter issued by PwC.

For the reasons discussed herein, we find that petitioners did not reasonably and in good faith rely on the PwC opinion letter and are liable for the section 6662 accuracy-related penalty for each year in issue.

VIII. Conclusion

We conclude that the reinvestment plan was in substance dividend payments from ASA to Barnes in 2000 and 2001, taxable under section 301. We also hold that the value of the clean rooms is not excludable from Barnes' 2001 income under section 109. We further hold that petitioners are liable for the section 6662(a) accuracy-related penalties.

**[*66]** In reaching our holdings herein, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.